**PEIGHTEL et al. v. UNITED STATES.**

**No. 9014.**

Circuit Court of Appeals, Eighth Circuit.

April 16, 1931.

**236**

Leslie J. Lyons, of Kansas City, Mo., and Frank B. Williams, of Springfield, Mo. (Donald E. Lyons, of Kansas City, Mo., on the brief), for appellants.

William L. Vandeventer, U. S. Atty., of Kansas City, Mo.

Before KENYON and VAN VALKEN-BURGH, Circuit Judges, and DAVIS, District Judge.

VAN VALKENBURGH, Circuit Judge.

Appellants were president and cashier, respectively, of the New First National Bank of Springfield, Mo. Jointly with the vice president and four directors of the bank, they were indicted in the District Court for the Southern Division of the Western District of Missouri, charged with violating and conspiring to violate section 5209, Rev. St. U. S., as amended (12 USCA § 592). The indictment contained ten counts. The first nine counts charged substantive offenses of alleged willful misapplication of the moneys and funds of said banking association. The tenth count charged conspiracy to commit these substantive offenses. The misapplications charged were in substance the withdrawal of funds of the New First National Bank and the application thereof to the payment of interest and installments of principal upon a certain promissory note, dated February 8, 1926, for the principal sum of $95,000, payable to George B. McDaniel and H. B. McDaniel, acting as trustees for the Springfield Clearing House Association, and signed by the defendants named in the indictment. The trial of the case resulted in the conviction of the president, vice president, and cashier, and the acquittal of the other directors. The vice president, Eslinger, was fined and the fine was paid. A sentence of three years in the penitentiary was assessed against President Peightel, and of eighteen months against Cashier Davis, appellants herein.

The contention of the government is that the $95,000 note was the obligation of the individual makers, and that funds of the bank were unlawfully applied upon the payment of their individual indebtedness. That of appellants is that this note was in fact primarily the obligation of the bank, the signers being merely accommodation makers or guarantors; that, for this reason, the funds of the bank were properly used in making the payments charged. Counsel for the government concedes that "if this were an obligation of the bank, then the whole case falls because the bank would certainly have a right to apply its assets on its own obligation." This consideration, then, forms the basis of this appeal, all other questions being subsidiary thereto.

The execution of the note in question arose out of the following circumstances: The Bank of Greene County was a state bank doing business in Springfield, Mo., and, about February 1, 1926, the state commissioner of finance caused to be made an audit and examination of its affairs. This was conducted by one Charles L. Bollinger, deputy commissioner, residing in Springfield. He discovered that certain assets of the Bank of Greene County must be replaced by money or approved securities or the bank must be closed. Apparently the Bank of Greene County, through its officers, directors, and stockholders, was unable or unwilling to make the replacements demanded, and its failure, therefore, became imminent. On just what precise date this situation became known to the Springfield Clearing House Association, representing the banks of Springfield, is not made clear by the record, and is perhaps not of serious importance. There had been two recent and disastrous failures of Springfield banks, from the shock of which that community had not fully recovered, and there was great natural anxiety on the part of the Clearing House and others to avoid a recurrence of like nature. Mr. Bollinger completed his examination on Saturday, February 6, 1926. The condition of the Bank of Greene County may have leaked out to the officers of the Clearing House a day or two before this, but certain it is that on the evening of February 6th a conference was held at Mr. Bollinger's residence, at which Mr. French, the state commissioner of finance, the president, and some other members of the Clearing House Association, and various officers of the Bank of Greene County, were present. The problem was to discover some means by which the threatened bank failure could be averted. From some source came the suggestion that the assets of the Bank of

Greene County should be purchased and taken over by the New First National Bank. Mr. Peightel, the president of the latter bank, was called in. Bollinger says "he was there later in the night I believe. He wasn't there at the original conference." Of course terms acceptable to the New First National Bank had to be agreed upon—terms upon which it could afford to take over the assets and liabilities of a failing bank without jeopardizing its own financial stability. The problem presented was not to rehabilitate the Bank of Greene County, which was going out of business, but rather to formulate terms safe and acceptable to the purchasing bank. Conferences to this end continued throughout the following day, Sunday, and until late into Sunday night. Among the assets of the Bank of Greene County were $115,000 in notes, described as "slow." Mr. George B. McDaniel, president of the Clearing House Association, testified that he "figured" that $20,000 to be contributed by the Clearing House "would take care of any loss in handling the $115,-000.00 of paper." Late Sunday night, or, rather, early Monday morning, final terms were agreed upon. The board of directors of the Bank of Greene County adopted a resolution empowering its officers to sell all its assets of every kind and character to the New First National Bank. A resolution of the latter bank authorized the purchase of all the assets of the Bank of Greene County, and the assumption of all its liabilities except those due to stockholders by reason of capital stock, undivided profits or surplus, or unpaid dividends. A contract pursuant to these resolutions was executed. The Clearing House Association agreed to contribute $20,000 and to make a loan of $95,000 to be evidenced by a note signed by the officers and directors of the purchasing bank, and secured by the aforesaid notes aggregating $115,000 as collateral thereto. In addition, property statements were required of and given by the makers. The $95,000 note was made payable to George D. McDaniel and H. B. McDaniel, leading Springfield bankers, as trustees for the Clearing House Association, in conformity with a trust agreement of even date. All the assets of the Bank of Greene County were delivered to the New First National Bank, including the $115,000 in notes, later deposited as collateral to the $95,000 note. Clearing House checks for $20,000 and $95,000 received the indorsement of the New First National Bank, and their proceeds were received and used by the New First National Bank in meeting the demands of its customers and those of the Bank of Greene County

which it had absorbed. None of the proceeds of these checks were received by the makers of the $95,000 note. All the transactions above recited took place on Monday, February 8th, following the conferences and agreements to which reference has been made.

The New First National Bank of Springfield, Mo., failed to open its doors for business March 17, 1928. A receiver, appointed by the Comptroller of the Currency, took charge of the bank April 13, 1928. This indictment was returned March 5, 1929.

The assignments of error specify:

1. The action of the court in overruling motions to quash. Conceding, without deciding, that a motion to quash can perform the office of a demurrer with respect to the matters therein stated, it is our opinion that the indictment is not vulnerable to attack by these motions, and that they were properly overruled.

2. The admission of evidence in the course of the trial as follows:

(a) The reports of the bank to the Comptroller of the Treasury which failed to show the $95,000 note as an obligation of the bank. These reports were properly admitted as bearing upon the question of whether this was or was not an obligation of the bank. The failure so to report this obligation was not charged as an offense against appellants in this indictment and could not be considered as an offense in this prosecution. An appropriate instruction to this effect should have been given if requested. In our opinion the request made was unfortunately framed.

(b) Admission of the testimony of H. B. McDaniel, president of the Clearing House Association, as to his understanding regarding the loan of $95,000:

"Q. (By the District Attorney) What is your understanding regarding this loan of the $95,000.00?"

Objections of counsel for appellants were overruled and exceptions saved.

"The Court: Just state his understanding. You may proceed with the answer. Objection overruled and exception allowed to defendants.

"A. We loaned the money to all the individuals to take up the notes regarded by the State Banking Department as questionable and to make the Greene County Bank solvent so it could pay its depositors dollar for dollar."

This witness had repeatedly stated that he had no communication with the officers and

directors of the New First National Bank or any of them at any time in the course of the negotiations, and therefore had no personal knowledge of the agreements made. His testimony respecting his "understanding" under the circumstances was incompetent in any view and its admission was erroneous.

(c) Character witnesses for the defense were repeatedly asked whether they did not know that some of the defendants, particularly the defendant Peightel, was indebted to his bank in a substantial sum at the time the bank closed. This fact, if it was a fact, was proof in this case neither of bad character, nor of guilt of the offenses charged. It is true that no such knowledge on the part of the witnesses was elicited, but the questions were objected to as prejudicial and the objections should have been sustained. Later appellants requested the following instruction: "The court instructs the jury that the fact, if you find it to be a fact, that either of the defendants was indebted to the New First National Bank at the time its affairs were placed in the hands of a receiver, is not, of itself, any evidence that such defendant is guilty of any crime charged in the indictment." The instruction requested was refused. We think, under the circumstances, it should have been given.

(d) The admission of Government's Exhibit 86, "Totals below to be used in consolidation Bank of Greene County 2—6—26." The foregoing words were shown to be in the handwriting of appellant Peightel. The exhibit was introduced to show that $115,000 in cash was apparently listed among the resources of the Bank of Greene County. It was explained that these figures do not appear in the books of the Bank of Greene County, but on a memorandum sheet pasted in the bank of that bank's daily statement, which memorandum was prepared after the merger had taken place. We do not think it was error to admit this exhibit in evidence, but its importance is negligible in view of the indisputable fact that the entire amount contributed, and loaned by the Clearing House went into the New First National Bank on the morning of February 8th.

3. Error is assigned to the refusal of certain requested instructions dealing with the nature of accommodation makers, and with the intent and good faith of appellants. It is complained that the court erred in its statement to the effect that mismanagement or maladministration does not constitute the crime of misapplication. We cannot agree with these criticisms. We think the court's charge quite fully, and to the understanding of the jury, covered all these points. It is possible the statement might properly have been more explicit in some particulars, but such exceptions as were timely made were met to the satisfaction of counsel according to the record, and no error can well be predicated upon the affirmative charge of the court.

4. We come now to the most serious question presented by the assignments of error. It is earnestly insisted that there is no substantial evidence to support the verdict and judgment, and that in the entire record there can be found no substantial evidence that is not consistent with the innocence of the accused. At the close of all the evidence appellants interposed demurrers, filed motions for directed verdicts, and requested the court to instruct the jury to acquit. All these tenders were overruled and denied, and exceptions were allowed.

Government counsel in his brief enumerates twelve so-called "facts showing the $95,000.00 note was a personal obligation." They are the following:

"No. 1. The note given by the defendants in no way indicates that it was an act of or for the benefit of the New First National Bank, but on its face shows it was an individual act.

"No. 2. The trust agreement does not mention or even intimate that it is an act of the New First National Bank or for the benefit of the New First National Bank, but shows on its face that it was a personal transaction.

"No. 3. George D. and H. B. McDaniel testified that the $20,000.00 donated and the $95,000.00 loaned were for the purpose of taking up the worthless and questionable paper in the Greene County Bank to make that institution solvent.

"No. 4. The daily statement of the Greene County Bank as of February 6, 1926, includes the item '115,000' under the heading 'cash' as assets of the Greene County Bank.

"No. 5. The list prepared by defendant Peightel and designated 'Totals to be used in the consolidation Greene County Bank' includes the following item: 'Cash, C/H Cks. 1 115,000.00'

"No. 6. The notes when turned over to the trustees for the Clearing House as collateral to the $95,000.00 note were delivered by Mr. H. D. Silsby, Cashier of the Greene County Bank, and Mr. Bollinger, a state bank examiner, an officer and an examiner of the

Greene County Bank, and in no way connected with the New First National Bank.

"No. 7. The books of the New First National Bank show the receipt of $115,000.00 in cash on February 8, 1926, but nowhere do these books reflect the receipt of the notes that were put up as collateral to the loan.

"No. 8. The note of $95,000.00 was never carried upon the books of the New First National Bank as a liability of that institution.

"No. 9. After the consolidation of these banks, reports were made to the Comptroller of the Currency as to the condition of the banking institution on the following dates: April 12, 1926, June 30, 1926, December 31, 1926, March 23, 1927, June 30, 1927, October 10, 1927, December 31, 1927, each of which were signed by both defendants Peightel and Davis and sworn to as being correct and in none of these reports do they mention as a liability of the New First National Bank, the $95,000.00 note.

"No. 10. Numerous printed statements were gotten out for their customers and for the public generally, were distributed at the bank and printed in the papers after consolidation and before failure and none of them listed as a liability of the bank the $95,000.00 note to the trustees for the Clearing House.

"No. 11. In 1926, Louis R. Elkins, a National Bank Examiner, examined the New First National Bank at Springfield, Missouri, this being the first examination after consolidation.

"He discovered that interest was being paid upon the $95,000.00 note from the assets of the bank. He called the directors' attention to this matter and they assured him that this note was a personal matter and that while they had paid interest on the note out of the bank's assets they had collected interest on the notes and deposited it in the bank, of sufficient amount to cover the amount taken out and they promised to make an adjustment entry of this matter.

"No. 12. The resolution of the New First National Bank signed by each of the defendants in this case, dated February 8, 1926, did not mention any loan being made to the New First National Bank or for its benefit although it discussed and gave permission for the proposed merger."

Numbers 1, 2, 8, 9, 10, and 12 of these enumerated facts may be considered together. It is not at all uncommon, as numerous decisions in this and other courts attest, for a bank obligation to be carried in the name of officers and directors. In such cases the true nature of the transaction is rarely, if ever, disclosed in the books of the banking association, in the instruments evidencing the debt, or in reports to the comptroller. There is, therefore, in the form of the $95,000 note, in the recitals of the trust agreement, and of the resolution of the New First National Bank authorizing the purchase, nor in the failure to list this note as a bank obligation upon the books of the bank, in reports to the comptroller, and in public printed statements, nothing necessarily inconsistent with the fact that the note was primarily the obligation of the bank. It is not unnatural that, in their contact with the bank examiner, soon after the consolidation as detailed in fact No. 11, the directors would have maintained an attitude of harmony with the apparent nature of the transaction.

Taking up Nos. 6 and 7, it is to be noted that Mr. Silsby, the former cashier of the Bank of Greene County, was to become vice president of the New First National Bank contemporaneously with the purchase or consolidation, and that Mr. Bollinger, as deputy state bank examiner, was interested in the financial stability of the completed transaction between the two banks. In no sense can he be considered the exclusive representative of the Bank of Greene County. It conclusively appears that the New First National Bank purchased all the assets of the Bank of Greene County, which would include the $115,000 notes, and that these notes found their way into the New First National Bank on the morning of February 8th. That they were subsequently delivered by Silsby and Bollinger as collateral to the $95,000 note has no significance, nor has the fact, in view of this circumstance, that their receipt was not reflected in the books of the New First National Bank.

Numbers 3, 4, and 5 seek to establish that the $115,000, composed of the Clearing House checks for $20,000 and $95,000, went into the Bank of Greene County, for the purpose of taking up its worthless and questionable paper; therefore, that the loan of $95,000 was not an obligation of the New First National Bank. We have already stated our view of the negligible importance of the list prepared by appellant Peightel designated "totals below to be used in consolidation Bank of Greene County," and respecting the competency of the "understanding" of H. B. McDaniel as to the object and purpose of the $95,000 loan. It is true that George D. McDaniel testifies that the loan was made to the

individual defendants, but he also stated that he considered that the $20,000 contributed by the Clearing House would take care of any loss in handling the $115,000 of paper. Of course, it is apparent that the New First National Bank was to handle this paper, and that the Bank of Greene County was not to reopen. The contention that the money of the Clearing House, aggregating $115,000 advanced and loaned, was to go to the Bank of Greene County to render it solvent and enable it to pay its debts dollar for dollar is a pure bookkeeping fiction. The New First National Bank assumed the payment of these debts by the terms of its purchase, and this money necessarily was turned over to it as an inducement to make that purchase, and to enable it to discharge its assumed obligations. That money went into the coffers of the New First National Bank. None of it was received and enjoyed by appellants. Why, then, did the officers and directors execute this note, if it was primarily the obligation of the bank? It may have been thought unwise that the bank, being a new banking association, should appear as a borrower from the Clearing House to this extent. It is certain that the officers of the Clearing House desired the personal security exacted. They wanted all the security they could get. Without doubt the makers of the note were individually bound, even though the note was primarily the debt of the bank. But it is suggested that the makers of the $95,000 note gave it in purchase of the $115,000 notes as a business venture. This, in view of all the circumstances, seems untenable. The notes were admittedly slow at best. George B. McDaniel concedes that $20,000 was required to take care of losses in handling them. Later he testified that he didn't think $20,000 was enough to take care of such losses. But why did this sum find its way into the New First National Bank, if that bank was not a party to this transaction? H. B. McDaniel testifies that he had investigated the condition of the assets of the Greene County Bank "far enough to know we didn't want anything to do with them"; that it would take $115,000 to make that bank solvent. This was due to the character of the $115,000 notes which the government contends the makers of the $95,000 note bought as a business venture. Later, in a letter demanding the balance due on this note from the officers and directors of the New First National Bank, this same witness, H. B. McDaniel, one of the Clearing House trustees, said in a letter addressed to the seven defendants below: "At a meeting of all the member banks of the Clearing House Association, a few days ago, it was unanimously decided that you as endorsers should be notified that prompt payment is expected. The trustees have had every desire to be considerate to the guarantors of the paper and we feel that the Clearing House Banks of Springfield are entitled to the thanks of the guarantors in the transaction."

[7] It is conceded that the writer referred to the New First National instead of the Savings Bank. Of course the testimony of the defendants below overwhelmingly tends to prove that the $95,000 note was primarily a bank obligation; but, in this analysis, we have confined ourselves to evidence brought out by the government witnesses, and in the presentation of the government's case. We do not consider the showing made by the defense. In such case, when the circumstances relied upon are as consistent with innocence as with guilt, they are robbed of all probative value. Tingle v. United States (C. C. A. 8) 38 F.(2d) 573; Turinetti v. United States (C. C. A. 8) 2 F.(2d) 15; Gold v. United States (C. C. A. 8) 36 F.(2d) 16, 33.

"Trial judge, unless there is substantial evidence excluding every other hypothesis but that of guilt, has duty of instructing verdict for accused." Read v. United States (C. C. A. 8) 42 F.(2d) 636; Spalitto v. United States (C. C. A. 8) 39 F.(2d) 782.

It is to be noted that the record satisfactorily fails to show any purpose or intent on the part of appellants and their associates, four of whom were acquitted, to defraud the bank. Such a purpose could be inferred only from the assumption that the makers of the $95,000 note bought this paper aggregating $115,000 for profit as a personal business venture. Under all the circumstances of this case we do not regard that assumption worthy of serious consideration. It must be conceded that this paper was regarded as worth at least $20,000 less than face value. And the $20,000 contributed to meet that anticipated deficit went to the New First National Bank —ultimately in any view. Doubtless, at the time of the so-called merger it was thought that the net result of the enlarged business would be profitable to the New First National Bank. Under such circumstances, officers and directors frequently lend their credit to the bank to enable it to finance the undertaking. Where public sentiment has been aroused by repeated losses from bank failures, trivial circumstances are frequently given undue weight. In such case relatively slight irregularities in the course of trial may control the issue.

What we have said is not to be construed as in approval of indirection in banking methods, nor of conduct which leads to relaxation of supervision and to dissipation of the funds of a bank with resulting loss to its patrons. We have addressed ourselves to the specific offense charged, and to the evidence relied upon to sustain the prosecution. We have held that where a defendant loans his personal credit to a bank to assist it in obtaining a loan, the proceeds of which go to the credit of the bank and are used for its benefit, the evidence is ordinarily insufficient to take the case to the jury in a prosecution for misapplying the funds of the bank used in discharging the obligation created by the loan. Long v. United States (C. C. A. 8) 24 F.(2d) 946. We think this ruling applies to the case at bar, that there was no substantial evidence to support the charge of misapplication, and that the demurrers to the evidence and the motions for directed verdicts should have been sustained. Inasmuch as the case must be tried anew, we have discussed questions raised on this appeal in rather more than usual detail.

It results that the judgments below must be reversed, and the case remanded for a new trial.