**GARGOTTA v. UNITED STATES.**
No. 10091.

Circuit Court of Appeals, Eighth Circuit.
May 10, 1935.

WOODROUGH, Circuit Judge, dissenting.

William L. Vandeventer, of Springfield, Mo. (Calvin, Vandeventer & Kimbrell, of Kansas City, Mo., on the brief), for appellant.

Randall Wilson, Asst. U. S. Atty., and Sam C. Blair, Asst. U. S. Atty., both of Kansas City, Mo. (Maurice M. Milligan, U. S. Atty., of Kansas City, Mo., on the brief), for the United States.

Before WOODROUGH and FARIS, Circuit Judges, and DONOHOE, District Judge.

DONOHOE, District Judge.

Appellant, hereinafter referred to as the defendant, was convicted on all three counts of an indictment, which charged him with receiving, concealing, and retaining in his possession with intent to convert to his own use, two certain pistols, property of the United States, with knowledge of the fact that such property had heretofore been stolen. His punishment was fixed at three years imprisonment on each count, to run concurrently, and a fine on the third count of $5,000. By appropriate proceedings, an appeal has been prosecuted to this court, which presents for our consideration certain errors alleged to have occurred during the trial, and the sufficiency of the evidence to support the verdict.

One of the errors alleged is based on the fact that Mrs. Florence McCoy, a contract stenographer employed on behalf of the government in the office of the district attorney, was present during the sessions of the grand jury that returned the indictment against the defendant, and took down the testimony. She was sworn not to divulge any of the testimony so record-

ed, and in the course of the proceedings she was called upon to read to the grand jury testimony pertaining to another case. She was not present during the deliberation. On the strength of these facts, a plea in abatement was entered on the ground that an unauthorized person was permitted to be present in the grand jury room during the time it was hearing testimony on which the indictment herein was based. The plea in abatement was overruled, and that order is assigned as error.

Section 556, title 18 USCA (as amended May 18, 1933), disposes of this alleged error. The testimony which she read to the jury during its deliberation had to do with a Mr. Claiborne's case, rather than the case of the defendant, and consequently no prejudicial error could be predicated on that circumstance.

Another alleged error is based on a statement made by the district attorney in his closing argument to the jury, which it is contended referred to the fact that the defendant did not take the stand in his own behalf. The language is as follows:

"Gentlemen, you have those two positive witnesses. That is not circumstantial evidence, Mr. Calvin. That is direct testimony going to the very vitals of this case. One of those witnesses testified that he took a concealed weapon from this man, the other that he had a gun in his hand, shooting at him, and threw it down. You have there the uncontradicted testimony of these two officers, not mere private citizens, but sworn officers of the law, that this man possessed both of these guns.

"Now, is there any explanation how he got possession of them? No explanation is offered to you, gentlemen of the jury. This man McLaughlin might try to insinuate some way, but you are not trying this case on insinuations of attorneys. There is no explanation of how he got the guns. If he got them honestly, if he did not receive them as stolen property, why did they not offer an explanation?"

While we think that this language approaches dangerously close to the forbidden zone, still it hardly encroaches thereon. The criticism seemed to be directed to the attorneys, who were conducting the case for the defendant. The attorneys might have called other witnesses, if any there were, to explain the possession of the guns. For the attorney in his argument to refer to the fact that there were no such other witnesses called would not be objectionable. Then, too, it will be observed that the pronoun "they" was used in the last question quoted instead of the pronoun "he." From this it would seem that the language could not be fairly construed as a comment on the defendant's failure to testify in his own behalf, and hence we do not find the statement to constitute reversible error.

The question of the sufficiency of the evidence is the serious question in the case. The first contention, that there was no competent evidence proving that the pistols in question were the property of the United States previously stolen, is readily disposed of. The testimony of Major Chafin in that connection, received without objection, was positive and direct, and sufficient in itself to take the case to the jury on that point. Hence we do not consider it necessary to dwell upon the other corroborating testimony. We think that the ownership and theft of these pistols was sufficiently and amply proven.

The remaining contention, that there is not on the record sufficient evidence to take the case to the jury touching defendant's knowledge that the pistols were stolen when he possessed them and when he concealed one of them, is to our mind the real and only question in the case. We will quote the testimony in detail in order that the evidence, or rather the lack of evidence, may speak for us:

The witness, Thomas B. Bash, sheriff, testified:

"Q. I will ask you to tell the jury about where you were about one o'clock a. m. on the morning of August 12, 1933? A. Driving south on Forest Avenue, between Armour and 34th Street.

"Q. And who was accompanying you? A. My wife, Deputy Hodges, and a little girl by the name of—a little orphan girl, I don't just remember her name at this time.

"Q. Did you reach the intersection of Forest Avenue and Armour Boulevard? A. No, I hadn't quite reached the intersection of Armour and Forest.

"Q. How near the intersection did you get? A. Approximately, somewhere between fifty and seventy-five feet.

"Q. I will ask you to state to the jury whether or not you saw the defendant, Charles Gargotta? A. I did.

"Q. At that place, at that time? A. I did.

"Q. Now, state to the jury what he was doing when you first saw him? A. He was shooting.

"Q. At whom? A. Me.

"Q. How far were you away from him? A. At that particular time I was some little distance. I wouldn't just exactly know in feet, twenty-five or thirty feet.

"Q. What was he shooting at you with? A. A revolver.

"Q. What kind of a revolver? A. .45 Colt Automatic.

"Q. I will hand you Government Exhibit No. 1, and ask you to state to the jury whether or not that is the revolver with which he was shooting at you? A. That is the revolver with which he was shooting at me.

"Q. Not a revolver, but an automatic pistol, I understand? A. Yes, sir.

"Q. Now, what happened then, Mr. Bash? A. He dropped the pistol, threw up his hands, and screamed for me not to shoot him.

"Q. What caused you to stop on that occasion? A. Because I had seen him drop this revolver and I thought he was defenseless at that time, that particular time.

"Q. I mean how did you happen to stop at that particular intersection? A. I heard some shooting and screaming.

"Q. I don't want to lead you, but you got out of the your car—A. Got out of the car, yes, sir.

"Q. Did you have any weapon in your car? I had a riot gun that I carry in my car at all times.

"Q. Then what did you do with reference to Gargotta? A. I placed this gun on him.

"Q. This riot gun, you mean? A. This riot gun, backed him up against the east side of the apartment building located on the southwest corner of Armour and Forest and then moved him around to the south side, just around to the south side, keeping my eye on this pistol at all times, at the same time, and immediately thereafter, my deputy, Hodges, started walking around from behind the car that the two men were in that I had just shot, and I told him to pick up the pistol that this man had dropped, and he did and brought me the pistol, and I placed it in my left trouser pocket."

(Here the witness identified the pistol as delivered to him by his deputy, and which contained the number "377,675," marked as Government Exhibit 1.)

Officer Hale testified that he was one of the officers who took the defendant to the station when he was arrested, immediately after the shooting referred to by the sheriff, and related the following as having taken place on the way:

"Q. Going over to the station did you take anything off of Charles Gargotta? A. Yes, sir.

"Q. What did you take? A. A .45 automatic.

"Q. A .45 automatic? A. Yes, sir.

"Q. Do you know whether it resembled Government's Exhibit 2 or not? A. Yes, sir, resembled that.

"Q. From where did you take it? A. No. 6 Station.

"Q. No, I mean from where did you take this pistol off of his person? A. Over his right rear pocket.

"Q. At the time or just prior to the time you took it off what did he say to you, if anything? A. My understanding is he said: 'You better take this off of me.' That is, at the time I took the gun from him.

"Q. Was it concealed? A. Yes, sir.

"Q. What did you do with the gun? A. Turned it to No. 6 Station. * * *

"Q. Do you know how it happened that Gargotta said to you 'You had better take this off of me'? A. No, sir.

"Q. Did you know he had it? A. When I felt it with my elbow. I was sitting very near him.

"Q. Do you mean over his pocket? A. Well, in the belt there.

"Q. You mean belt of his trousers? A. Yes.

"Q. Was it stuck inside of the trousers? A. Yes. * * *

"Q. Will you please state to the Court and jury, if you can, how Charles Gargotta was dressed on the evening that you saw him, as to his headgear? A. Why, he had on a dark gray cap."

The witness, Miss Houston, identified a written statement, prepared shortly after the shooting, which she read to Mr. Gargotta sentence by sentence. She stated that after reading a sentence, a Mr. Mastin propounded the question to the defendant, "Is

that true?" and to each of these questions the defendant answered in the affirmative. The written statement is as follows: "My name is Charley Gargotta. I live at 633 Garfield, I am 33 years old, born and raised in Kansas City, married, have one son five years old. About 10:30 tonight, I ate supper on 5th Street at the White Kitchen between Grand and Walnut on 5th Street. There were several people around the Kitchen. I ate some sardines and potato salad. I went into the Kitchen and ate by myself. I was in the Kitchen about ten or fifteen minutes. I sat around 5th and Grand for a while, perhaps fifteen or twenty minutes or maybe a half hour. I walked from 5th and Grand to 7th Street and got a taxicab. The cab was standing at the southeast corner of 7th and Grand. I got in the cab and drove to the Cavalier Apartment at 1109 Armour. I gave the cab man fifty cents and I went in the apartment. I walked upstairs to the fourth floor and saw a young lady named Helen. I met her two nights ago or maybe three nights ago. I met her at Grand Avenue between 10th and 11th. Met her again tonight about the same place, this was about 11:00 o'clock, maybe five or ten minutes before or after, and she asked me to come to see her. She and I came to 7th and Grand, got in the cab and went to her apartment. I stayed there until about one o'clock, maybe ten or fifteen minutes earlier or later. I walked down the steps and walked out to the sidewalk. I didn't see anyone at the apartment or on the sidewalk that I knew. I started walking toward a cab that was waiting there when I heard some shooting. I was walking a little east to get the cab and heard the shooting begin. The shooting seemed to be east of me and out in the middle of the street. There were several shots fired. I saw a fellow standing in the street. I didn't see him shoot or have a gun. I ran across Armour Boulevard to sidewalk on north side of the street. A man walked towards me with a shotgun in his hand and said 'stick up your hands.' He told me several times to hold my hands up and I kept them up. This man handcuffed me and kept me until two policemen came and took me to No. 6 Station. I didn't see anyone near the apartment or the shooting whom I recognized. I had nothing in my hand when I crossed the street and had no gun or pistol of any kind. I never have owned an automatic pistol. The policeman did not take an automatic from me or out of my pocket or possession after they had me in their car or at any time. I had no revolver or pistol in my possession at all. I never wore a cap in my life. I usually wear a hat and did tonight. I had my hat when I came out of the apartment and missed it just after the man with the gun said 'stick them up.' The cap I saw in the sheriff's office is not mine. Helen is a tall dark complected woman. I don't know whether her hair was blond, dark or red. She walked up the the four flights of steps with me."

The witness, Edward E. Conroy, special agent, testified that he saw the defendant on the morning of May 10, 1934, and talked to him concerning the possession of these pistols; that the defendant was asked regarding them, and he denied that he had ever had them in his possession, and stated that he did not know anything about the guns; that the defendant read aloud Government Exhibit 17, especially the typewritten part in the center thereof; that the witness paid particular attention while the defendant read the numbers of the guns and read the phrase "Property of the United States of America." Exhibit 17 referred to is the complaint filed on the 10th of May, 1934, and which contains the words "said pistols then and there being the personal property of the United States."

The witness Anderson, special agent, testified that on the morning of May 10, 1934, he asked the defendant what he knew about the guns named in the complaint, and the defendant answered that he did not know a thing about the guns; that he didn't carry guns; and that he never had the two guns in question in his possession.

The witness Trainor, special agent, testified that he was present during the interview of May 10, 1934; that he had a conversation with the defendant in which he asked the defendant what knowledge he had concerning the pistols, and how he could explain the charge; that the defendant then stated that he had no knowledge of the pistols; that he had never had them in his possession and knew nothing whatever about them.

The pistols, Government Exhibits 1 and 2, had stamped on the magazine, below the barrel, on the left hand side, the words: "United States property." The stamp is indented in caps, 10 point long primer type, and extends along the magazine $1\frac{3}{4}$ inches. Both are identical, and neither show any attempt at obliteration or mutilation.

The foregoing constitutes the sum total of the evidence. The defendant did not testify, nor did he call any witness in his own behalf, and the verdict of conviction must either be upheld or reversed on this record.

The writer hereof has difficulty in keeping his mind from reverting to the fact that the defendant was with gangsters, and was using one of the pistols in a deadly assault on the sheriff when they were first found in his possession. No doubt the jurors had the same difficulty in their deliberations. The prosecuting officers have seen fit to press the minor offense for reasons not appearing of record. The defendant is not on trial for the major offense. That is left for another day and another jurisdiction, and must not be permitted to prejudice the defendant in his constitutional right to a fair trial on the charges of the indictment.

The nature of the situation calls for calm and dispassionate deliberation. The court should not recede from its well-defined and often announced principles of law, nor should we expand or contract those principles in order that we may make a special application to this case. It may be a gangster to-day, while tomorrow it may be a first citizen. Since a chain is no stronger than its weakest link, our constitutional rights and guaranties are no more secure, and we may expect no greater protection than is given to us by the court's weakest decision. In fact, it has been intimated somewhere to this court that a reversal herein would outrage public opinion in Kansas City, where the alleged crime was committed, and the cause of law enforcement would suffer resultant injury. Law enforcement should be within the law. Law officers should be meticulous in giving to every culprit the protection of his every lawful right, and consequently the resultant fair trial. There is but little difference in principle between unlawful mass action countenanced or tolerated by a court, and the unbridled movement of the mob on the street or in the alley. The defendant is presumed to be innocent, and this presumption is a real presumption in his favor which abides with him at every stage of the trial. The burden of proof was on the government to prove his guilt beyond a reasonable doubt. No principles of criminal law are more firmly fixed than these. They have been proclaimed by every court

of record throughout the land. They go to the very basis of our liberties.

With safety then, may we not in the performance of this duty keep this principle foremost in our minds, and at least for the time being keep our mind free from thoughts of the character of the defendant, and other crimes that may or might be chargeable to him?

The proven facts may be summarized as follows:

(1) That the pistols were stolen from the supply room of the National Guard Armory at Seventh and Barnett streets, in Kansas City, Kan., on October 23, 1932.

(2) That they were found in the possession of the defendant at Armour and Forest avenue, Kansas City, Mo., at about 1 o'clock on the morning of August 12, 1933.

(3) That the defendant, when arrested, on the morning of August 12, 1933, denied the possession of the pistols. On the same day, he again denied possession when arraigned, and said he knew nothing about them, and again on May 10, 1934, he stated he knew nothing about the pistols, and had not ever had them in his possession.

(4) That on May 10, 1934, the defendant read aloud the complaint, including the words contained therein: "Said pistols then and there being the personal property of the United States."

(5) That the pistols had stamped thereon the serial numbers 377,675 and 69,791, and the words "United States Property" and "Model of 1911, U. S. Army."

The gist of the offense charged in all three counts of the indictment is that he knew, or had knowledge, that the pistols had been stolen at the time that he received, concealed, or aided in the concealment, or had or retained them in his possession.

This court has frequently announced and committed itself to the rule: "Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial judge to instruct the jury to return a verdict for the accused, and where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of this court to reverse a judgment against the plaintiffs in error." Van Gorder v. United States (C. C. A. 8) 21 F.(2d) 939, 942; Spalitto v. United States (C. C. A. 8) 39 F.(2d) 782; Cravens v. United States (C. C. A. 8) 62

F.(2d) 261; Peightel v. United States (C. C. A.) 49 F.(2d) 235. Consequently, we must examine and consider this evidence without doing violence to this rule of law.

The evidence relied upon by the government as showing, or tending to show, the guilty knowledge is circumstantial, and the circumstances of a criminatory nature relied upon are:

(a) That the pistols were found in his possession; that he admitted on the way to the station possession of one, by saying: "You better take this off of me."

(b) No evidence was offered to explain the possession.

(c) He denied that he ever had the pistols in his possession on different occasions, and said he had not ever had them in his possession, and knew nothing about them.

(d) That he could read English.

(e) That stamped on the pistols were the serial numbers, and the words "United States Property" and "Model of 1911, U. S. Army."

There is no evidence to show, or tending to show, either direct or circumstantial, when, where, or the circumstances under which the defendant acquired or came into possession of the property, nor the length of time they were in his possession. There is no evidence, either direct or circumstantial, showing any fabrication, suppression, or spoliation of evidence by the defendant. The evidence does not show that the defendant made any inconsistent explanation of any of the circumstances in the case, but merely consistently denied that he had the pistols in his possession, or knew anything about them. Neither is there any evidence to show an attempt to hide or secrete or dispose of the pistols.

Is the circumstantial evidence here sufficient to sustain the verdict, or must there be other circumstances presumed before we can reach any such conclusion? In United States v. Ross, 92 U. S. 281, 284, 23 L. Ed. 707, the court, in announcing the law, said: "Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved, and not themselves presumed."

That court cited with approval the rule stated in Starkie on Evidence, page 80, as follows: "In the first place, as the very foundation of indirect evidence is the establishment of one or more facts from which the inference is sought to be made,

the law requires that the latter should be established by direct evidence, as if they were the very facts in issue."

The court further stated in that same case: "The law requires an open, visible connection between the principal and evidentiary facts and the deductions from them, and does not permit a decision to be made on remote inferences."

And further: "A presumption which the jury is to make is not a circumstance in proof; and it is not, therefore, a legitimate foundation for a presumption."

And again by the same court: "They are inferences from inferences; presumptions resting on the basis of another presumption. Such a mode of arriving at a conclusion of fact is generally, if not universally, inadmissible. No inference of fact or of law is reliable drawn from premises which are uncertain."

■ This court has likewise held, and it is well settled in this circuit, that presumptions cannot be based on presumptions. Brady v. United States, 24 F.(2d) 399 (C. C. A. 8); Vernon v. United States, 146 F. 121 (C. C. A. 8); Miller v. Union Pac. Ry. Co. (C. C. A.) 63 F.(2d) 574.

■ It should be readily conceded that the mere possession alone of the pistols 293 days after the larceny would not in itself raise the legal presumption that the defendant stole them. Mere possession alone, after such a lapse of time, cannot in any sense be considered so recent a possession as to sustain a finding of guilty knowledge that the property was stolen.

In the case of Van Gorder v. United States, 21 F.(2d) 939, 941 (C. C. A. 8), it was said:

"Counsel for the government argue that the fact that on April 15, 1924, when the defendant was arrested, 87 days after the keys were missed at Poplar Bluff, they were found among the effects of the defendant, raised the legal presumption that he stole them on January 17, 1924. Conceding that facts and circumstances may exist in a case from which such a presumption may arise from the recent possession by a defendant of stolen property that he had guilty knowledge that the property was stolen, and hence that he was the thief, nevertheless, in such a case the presumption that the defendant was the thief rests on the presumption that he had guilty knowledge that the property was stolen.

In the case in hand the only evidence against the defendant was his possession of the missing keys and the mere possession of stolen property is insufficient to sustain a finding that the possessor had guilty knowledge that it was stolen, much less, the subsequent presumption that he was the thief. Degnan v. U. S. (C. C. A.) 271 F. 291; Kasle v. U. S. (C. C. A.) 233 F. 878, 888, 889, 890, and cases there cited; Minor v. State, 55 Fla. 90, 96, 45 So. 818.

"Moreover, the possession of stolen goods alone raises no presumption of guilty knowledge or of stealing by the possessor, unless it was recent, so recent that ample time and opportunity may not have been given to transfer the stolen property from the thief to another between the date of the theft and that of the arrest or seizure."

And again, by the same court: "Eighty-seven days after the alleged theft was not so recent a possession under the facts and circumstances of this case as to sustain a finding of either guilty knowledge of the defendant that the keys were stolen property or of the fact that he was the thief."

The cases relied upon by the government as authority for its contention that the fact of possession standing alone is some evidence to be considered with all the other facts are cases where the other evidence or circumstances relied upon are of an entirely different nature, and upon examination will disclose that there was inconsistent statement, attempt to conceal, an attempt to sell for less than the fair value, spoliation, fabrication, suppression of evidence, or contradictory explanations of the possession, all of which are entirely absent in the case at bar.

The fact that no explanation was offered by the defendant of his possession is answered by the fact that he consistently denied such possession, and denied all knowledge of the pistols, which of course left no explanation of his possession necessary. Had he offered an explanation inconsistent with his denial of possession, then we might have a different case; but his failure to offer an explanation is not inconsistent with his denial of possession.

■ Was the fact that the pistols bore the inscription "United States Property," and the fact that the defendant could read English, sufficient as a circumstance to show guilty knowledge? In considering these facts, we are first met with the proposition that we must presume:

First.—That he had the pistols either in the lamplight or the daylight. The evidence shows that they were found in his possession at 1 o'clock in the morning on the street.

Second.—We next must presume that he read the inscription in the lamplight or daylight, and then we next must infer that the effect of reading the inscription was sufficient to register in his mind the consciousness that it was stolen property.

We have a situation of two circumstances not proved, but presumed, on which we are asked to presume that the defendant had guilty knowledge. This is the very thing which the authorities hereinbefore cited condemn.

Does the fact that he denied possession of the stolen property show, or tend to show, guilty knowledge? Does it have any evidential value in that respect? At the time of the denials, he was in custody. Again we must rely upon circumstantial evidence to determine the purpose of the false statements. May these statements be considered as evidence of guilty knowledge that the pistols had been stolen, or were they made to avoid prosecution by the state of Missouri? From the facts disclosed, it would seem that he might have been prosecuted for any one of three separate felonies; namely: Assault with intent to kill; exhibiting a deadly weapon in a rude, angry, and threatening manner; and carrying concealed on or about his person a dangerous and deadly weapon. If the defendant had in mind any such prosecution, his denials then would merely amount to a claim of innocence, so that in this case, for the denials to have any evidential value, the jury would have to presume, even in the broadest view, that the defendant had in mind that he was going to be arrested and prosecuted for unlawful possession with guilty knowledge. They must first draw the inference that the defendant at the time of these denials had in mind and anticipated this prosecution, and from that fact they must draw another inference that his denials were prompted by a consciousness of guilty knowledge, for unless the defendant had in mind this prosecution, and not some other threatened or impending prosecution, his denials would have no evidential value as showing the condition of his mind with reference to this cause.

Going back to the proposition of law heretofore stated, is the government's evi-

dence, both direct and circumstantial, as consistent with innocence as it is with guilt? If it is, then it is insufficient to sustain the verdict. The circumstances relied upon, that the defendant was found in possession of the pistols, that they had stamped thereon the words "United States Property," we believe are just as consistent with the innocence of the defendant as with his guilt in this case, and we have been unable to find substantial evidence of fact which excludes every other hypothesis than that of guilt. For example, may we not infer from the proven facts:

(a) That the defendant purchased the pistols for a fair price.

(b) That the defendant came into the possession of the pistols innocently.

(c) That he obtained the pistols from some person lawfully in possession thereof.

(d) That the defendant came into possession of the pistols immediately before the conflict or shooting, or during the progress thereof.

(e) That the pistols were received by him in the dark, and that he never had them in the light to see or read the inscription thereon, or that he had picked up the pistols hurriedly in the apartment of the lady, or that she thrust them into his hands at the time he left, when the shooting commenced.

In any one of these situations, the defendant would be wholly innocent of the charge of guilty knowledge.

After a careful study of the authorities, and a scrutiny of the evidence, we are unable to divest our minds of the conclusion that there was not sufficient evidence of guilt of the defendant to sustain the verdict.

The judgment is therefore reversed, and the case remanded to the court below for further proceedings.

WOODROUGH, Circuit Judge (dissenting).

In my opinion a prima facie case was made out against Gargotta which was for the jury. He had in his possession two automatic pistols belonging to the United States, stolen from an armory not an hour's ride distant from the place of his arrest; they bore the legend stamped conspicuously upon them, "Property of the United States of America," and he could read that legend. It was shown that ordnance property generally belonging to the government had never been offered for sale to the public. The President had been authorized by Congress to sell guns and ammunition to members of the National Rifle Association and other recognized associations for the encouragement of small arm target practice, but there was no evidence that the power had ever been exercised. Some weapons like those in the possession of the accused were on occasions sold to regular officers of the United States Army, but only upon certification that they were for the officers' personal use. When asked about his possession of the weapons by federal agents whom he knew to be concerned about the government property, the accused declared he never had them.

Perhaps it was not impossible for him to have come into possession of the weapons without anything to put him on notice that they were the property of the United States and stolen. It may not be impossible that he found them on the street in the dark, just before his arrest; or had them handed to him there; or had not had a chance to read the inscriptions on them. Such speculative possibilities can always be conjured up because we have no absolute demonstration of knowledge or intent. If a man is seen to be admiring a world's masterpiece in the art gallery and is found with it cut from the frame and rolled up under his coat within the hour, there is always the same thing to be said; possibly he found it, or had it handed to him, or did not know it had been stolen. If he keeps perfectly still and nobody saw the crime committed, such conjectural possibilities may persist.

But the ruling does not turn thereon. It turns on reasonable inference. What is the reasonable inference to be drawn from the accused's possession of these weapons— one of them drawn in his hand, the other hidden in his bosom; and from his denial that he had them?

Light is thrown on the question by occurrences too widely published and generally known to be ignored by the courts; namely, the frequent robberies of armories and arsenals in late years and the arming of public enemies with government weapons so obtained. It ought not to be assumed that a man who is found with two such weapons so stolen from a nearby armory has never read or heard about it like his neighbors. The government stamps the declaration of its ownership on the weapons and takes precautions to prevent them

from falling into other possession or ownership. They are not so entirely unique as art masterpieces, but they do have a special character that immediately suggests inquiry when they are found out of their setting. They can hardly come into the hand of a layman unless crime has been committed to obtain them. When the inevitable inquiry arises, the spontaneous exclamation, "How did you get those government pistols," and the answer of the possessor is, "I never had them", you infer guilty knowledge, and nothing else. It is the reasonable and natural inference.

I think the court should confront this actuality directly. The injuries and disorders which are inflicted on society by evilly disposed persons who succeed in possessing themselves of these deadly government weapons are but too well known. An individual who is found with two of them on his person, clearly marked and proved to have been stolen, and who has falsely denied his possession is more than a suspect. There is proof against him which sustains belief and calls for explanation if he is innocent. To hold him to his proof deprives him of no right or immunity which any man ought to have. If he came by the guns in some such way that he did not know they were stolen property, the fact could doubtless be shown; but I think that in the absence of any such showing the duty of the court was to let the jury decide.

There is no direct precedent to the contrary, and sensible regard for the public safety, under conditions as they are, requires that the conviction be affirmed.