HICKMAN *v.* JONES ET AL.

1. A prosecution in a so-called "court of the Confederate States of America," for treason, in aiding the troops of the United States in the prosecution of a miltary expedition against the said Confederate States, is a nullity, and the fact that the tribunal had clothed itself in the garb of the law gives no protection to persons who, assuming to be its officers, were the instruments by which it acted.

2. Where there is evidence before the jury—whether it be weak or strong—which does so much as *tend* to prove the issue on the part of either side, it is error if the court wrest it from the exercise of their judgment. It should be submitted to them under instructions from the court.

3. The fact that a man was himself a traitor against the United States, does not necessarily prevent his recovering damages against other traitors, for having maliciously arrested and imprisoned him before a so-called court of the Confederate States, for being a traitor to these; the alleged treason having consisted in his giving aid to the troops of the United States while engaged in suppressing the rebellion.

* 6 Wallace, 142.   † 13 Peters, 436.   ‡ 3 Howard, 32.

ERROR to the District Court for the Northern District of Alabama, in which court Hickman, the plaintiff in error, sued Jones, Moore, Regan, Coltart, Clay, and others, defendants in error, for maliciously causing him to be arrested, imprisoned, and prosecuted for a criminal offence, without probable cause.

*Mr. R. Johnson, for the plaintiff in error ; Messrs. Walker and Gordon, contra.*

. Mr. Justice SWAYNE, stated the case, and delivered the opinion of the court. .

The facts disclosed in the record, so far as it is necessary to state them, are as follows:

During the late civil war the rebel government established a court known as the "District Court of the Confederate States of America for the Northern District of Alabama." In that court the plaintiff in error was indicted for treason against the Confederate States. The indictment alleged that troops of the United States were in the Northern District of Alabama engaged in a hostile enterprise against the Confederate States, and that Hickman "did traitorously then and there assemble and continue with the said troops of the said United States in the prosecution of their said expedition against the Confederate States; and then and there, with force and arms and with the traitorous intention of co-operating with the said troops of the United States in effecting the object of the said hostile expedition, did array and dispose himself with them in a hostile and warlike manner against the said Confederate States; and then and there, with force and arms, in pursuance of such his traitorous intentions, he, the said James Hickman, with the said persons, so as aforesaid assembled, armed, and arrayed in manner aforesaid, wickedly and traitorously did levy war against the said Confederate States." Upon this indictment a warrant was issued for the arrest of Hickman. He was arrested and imprisoned accordingly. He applied to the defendant, Jones, who assumed to act as judge of the court, to be allowed to

give bail.   Jones rejected the application and remanded him to prison.   He was subsequently tried, acquitted, and discharged.   He alleges that the proceeding was without probable cause and malicious.   Moore was the clerk of the pretended court.   The name of Regan is signed to the indictment as district attorney, and he conducted the trial.   Robert W. Coltart was deputy marshal, and Clay was the editor and publisher of the "Huntsville Confederate," a newspaper through which it was alleged he incited the prosecution by means of malicious attacks upon Hickman designed to produce that result.   The other defendants were members of the grand jury by which the indictment was found.   Testimony was given tending to show that the plaintiff sympathized with the rebellion and participated in it while the rebel power predominated in North Alabama, both before and after its first invasion by the forces of the United States. The court instructed the jury, among other things, as follows:

"If, in the case at the bar, you believe that the acts and speeches of the plaintiff, upon which the defendants rely to prove his complicity with the rebellion, were the result of anything less than a fear that if he did not so speak and act, his life or his liberty or his property would be sacrificed to his silence or his omission, you will find a verdict for the defendants.

"If, on the other hand, you believe that these acts of apparent complicity with the rebellion were performed by the plaintiff under the influence of an honest and rational apprehension that to do otherwise would expose him to persecution or prosecution, or to loss of life, liberty, or property, and that notwithstanding these acts of affiliation with the rebel community in which he lived, he was always at heart honestly and truly loyal to the government of his country, he is entitled to your verdict."

The jury were further instructed that it was their duty to acquit the defendants, R. W. Coltart and Clay.   Exceptions were duly taken by the plaintiff, and the case is brought here for review.

We have to complain in this case, as·we do frequently,

of the manner in which the bill of exceptions has been prepared. It contains all the evidence adduced on both sides, and the entire charge of the court. This is a direct violation of the rule of this court upon the subject. We have looked into the evidence and the charge only so far as was necessary to enable us fully to comprehend the points presented for our consideration—thus in effect reducing the bill to the dimensions which the rule prescribes. No good result can follow in any case from exceeding this standard Our labors are unnecessarily increased, and the case intended to be presented is not unfrequently obscured and confused by the excess.

The rebellion out of which the war grew was without any legal sanction. In the eye of the law, it had the same properties as if it had been the insurrection of a county or smaller municipal territory against the State to which it belonged. The proportions and duration of the struggle did not affect its character. Nor was there a rebel government *de facto* in such a sense as to give any legal efficacy to its acts. It was not recognized by the National, nor by any foreign government. It was not at any time in possession of the capital of the nation. It did not for a moment displace the rightful government. That government was always in existence, always in the regular discharge of its functions, and constantly exercising all its military power to put down the resistance to its authority in the insurrectionary States. The union of the States, for all the purposes of the Constitution, is as perfect and indissoluble as the union of the integral parts of the States themselves; and nothing but revolutionary violence can, in either case, destroy the ties which hold the parts together. For the sake of humanity, certain belligerent rights were conceded to the insurgents in arms. But the recognition did not extend to the pretended government of the Confederacy. The intercourse was confined to its military authorities. In no instance was there intercourse otherwise than of this character. The rebellion was simply an armed resistance to the rightful authority of the sovereign.

Such was its character in its rise, progress, and downfall. The act of the Confederate Congress creating the tribunal in question was void. It was as if it were not. The court was a nullity, and could exercise no rightful jurisdiction. The forms of law with which it clothed its proceedings gave no protection to those who, assuming to be its officers, were the instruments by which it acted. In the case before us, trespass would have been the appropriate remedy; but. the authorities are clear that case also may be maintained. Each form of action is governed by its own principles. It is needless to consider them, as none of the exceptions taken relate to that subject. Our opinion will be confined to those which have been specifically mentioned.

1. The court instructed the jury to acquit the defendants, J. W. Clay and R. W. Coltart.

There was some evidence against both of them. Whether it was sufficient to warrant a verdict of guilty was a question for the jury under the instructions of the court. The learned judge mingled the duty of the court and jury, leaving to the jury no discretion but to obey the direction of the court. Where there is no evidence, or such a defect in it that the law will not permit a verdict for the plaintiff to be given, such an instruction may be properly demanded, and it is the duty of the court to give it. To refuse is error. In this case the evidence was received without objection, and was before the jury. It tended to maintain, on the part of the plaintiff, the issue which they were to try. Whether weak or strong, it was their right to pass upon it. It was not proper for the court to wrest this part of the case, more than any other, from the exercise of their judgment. The instruction given overlooked the line which separates two separate spheres of duty. Though correlative, they are distinct, and it is important to the right administration of justice that they should be kept so. It is as much within the province of the jury to decide questions of fact as of the court to decide questions of law. The jury should take the law as laid down by the court and give it full effect. But its application to the facts—and the facts themselves—it is for them to determine.

These are the checks and balances which give to the trial by jury its value. Experience has approved their importance. They are indispensable to the harmony and proper efficacy of the system. Such is the law. We think the exception to this instruction was well taken.*

2. The other instruction to be considered was, substantially, that if the plaintiff had himself been a traitor he could not recover against those who had been instrumental in his arrest, imprisonment, and trial for treason against the Confederacy—the treason alleged to consist in the aid which he had given to the troops of the United States while engaged in suppressing the rebellion.

As matter of law, we do not see any connection between the two elements of this proposition. Giving aid to the troops of the United States, by whomsoever given, and whatever the circumstances, was a lawful and meritorious act. If the plaintiff had before co-operated with the rebels there was a *locus penitentiæ*, which, whenever he chose to do so, he had a right to occupy. His past or subsequent complicity with those engaged in the rebellion might affect his character, but could not take away his legal rights. It certainly could not, as matter of law, give impunity to those by whose instrumentality he was seized, imprisoned, and tried upon a capital charge for serving his country. Such a justification would be a strange anomaly. Evidence of treasonable acts on his part against the United States was alien to the issue before the jury. To admit it, was to put the plaintiff on trial as well as the defendants. The proofs upon the question thus raised might be more voluminous than those upon the issue made by the pleadings. The trial might be indefinitely prolonged. The minds of the jury could hardly fail to be darkened and confused as to the real character of the case and the duty they were called upon to discharge. The guilt of

---

* Aylwin *v.* Ulmer, 12 Massachusetts, 22; New York Fire Insurance Company *v.* Walden, 12 Johnson, 513; Utica Insurance Company *v.* Badger, 3 Wendell, 102; Tufts *v.* Seabury, 11 Pickering, 140; Morton *v.* Fairbanks, Ib. 368; Fisher *v.* Duncan, 1 Hening and Munford, 562; Schuchardt *v.* Allens, 1 Wallace, 359.

the plaintiff, if established, could in no wise affect the legal liability of the defendants; nor could the fact be received in mitigation of damages. It is well settled, that proof of the bad character of the plaintiff is inadmissible for any purpose in actions for malicious prosecution.* All the evidence upon this subject disclosed in the bill of exceptions was incompetent, and should have been excluded from going to the jury. This instruction also was erroneous.

Judgment REVERSED, and the cause remanded to the court below, with an order to issue a *venire de novo.*

---

* 1 Greenleaf's Evidence, § 55.