CURLEY v. UNITED STATES.

SMITH v. SAME.

FULLER v. SAME.

Nos. 9208, 9209, 9215.

United States Court of Appeals
District of Columbia.

Argued June 6, 1946.

Decided Jan. 13, 1947.

Writ of Certiorari Denied June 2, 1947.
See 67 S.Ct. 1511.

WILBUR K. MILLER, Associate Justice, dissenting in part.

Mr. William E. Leahy, of Washington, D. C., with whom Mr. Nicholas J. Chase, of Washington, D. C., was on the brief, for appellant in No. 9208.

Mr. William A. Gallagher, of Washington, D. C., for appellant in No. 9209.

Mr. T. Emmett McKenzie, of Washington, D. C., for appellant in No. 9215.

Mr. William A. Paisley, Sp. Asst. to the Atty. Gen., with whom Mr. Edward M. Curran, U. S. Atty. at the time the brief was filed, of Washington, D. C., was on the brief, for appellee.

Mr. Sidney S. Sachs, Asst. U. S. Atty., of Washington, D. C., also entered an appearance for appellee.

Before EDGERTON, WILBUR K. MILLER and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

Appellants were indicted for violation of the mail fraud statute[1] and for conspiracy to violate that statute.[2] Trial was had before a jury. At the conclusion of the case for the prosecution, the defendants moved for directed verdicts of acquittal. The court denied the motions. Defendants Curley and Fuller stood on the motions and offered no evidence. Defendant Smith presented eight character witnesses and proffered certain documentary evidence. These three defendants were convicted on the conspiracy count. They were acquitted on some of the substantive counts and convicted on others. The appeals were consolidated for argument.

The evidence can be skeletonized for present purposes. There was an organized group, called Engineers' Group, later incorporated. The membership in the Group was identified, consisting, so far as here material, of its officers. Certain activities were carried on in the name of the Group, and the mails were used in furtherance thereof. Those activities included the negotiation and execution of contracts with manufacturing and construction concerns and the receipt of money from those concerns. The contracts related to the procurement of government war work and housing construction, and the furnishing of engineering and similar service in connection with that work. In the negotiation of the contracts, representations were made in the name of the Group as to business controlled by it, its staff, its assets, and the .

[1] 18 U.S.C.A. § 338.

[2] 18 U.S.C.A. § 88.

existing status of various government projects. The money was received by the Group under agreements that it be held as deposits and returned if contemplated business projects did not materialize.

The representations were false, and the agreements were not kept, except that three refunds were made from funds paid in by other people. The Group was represented as having within its control the designation of contractors on certain government housing projects and war work. It had none. Its staff was represented as large and experienced. It was not. It was represented as having large amounts of cash in bank and extensive security holdings. It had no such amounts or holdings. Certain housing projects were represented as having been approved by the Federal Housing Administration. They had not been. Commitments on financing were represented as having been made by financial institutions on certain projects. No such commitments had been made. These various representations were inducements for the contracts made by the Group with its customers or clients. They were made verbally, in letters, in contract agreements, and in a brochure widely distributed. The money received as deposits was not held but was spent as received.

The representations above described, or some of them, were made to every concern with which the Group concluded a contract, and to others with whom no contracts were concluded. The money received as deposits was the only money the Group ever received. No money was paid in to it as capital, although the corporation's financial statements indicated outstanding stock in the amount of $20,000; and none was loaned it by its owners or otherwise.

Engineers' Group began activities in June or July, 1941, and was incorporated in October of that year. The venture disintegrated in February, 1942, with overdrafts at the bank, unpaid wages to employees, and other unpaid bills. About $67,000[3] had been received from customers and about $9,600 refunded to them.

The representations made in the name of the Group were usually made by appellant Fuller, its vice president. The contracts were in large part negotiated by Fuller, and all were executed by him. The office was managed by him, and he controlled the disposition of the funds on hand. He withdrew about $18,000 "in checks to himself or otherwise."

Appellant Curley was president of the Group from June 26, 1941, and of the corporation from its incorporation until his resignation about the middle of December, 1941. He introduced several customers, or clients, to Fuller, with statements such as that Fuller, "our man in Washington", had a project that was all ready to materialize, all ready to go; and "Mr. Fuller is our man who handles the details of these matters"; and "this group had several jobs and several contracts and they needed contractors to do them." Curley at one time sought to secure a "loan" from a bank to the Group, upon an understanding that the amount would remain in the bank as an account in the name of the Group, not subject to withdrawal; and that the bank would advise any inquirer that the Group had that amount on deposit at the bank. Curley knew money was being received by the Group upon condition that it be returned, as at least one depositor invoked his aid in securing a return of his deposit. Curley was frequently at the office of the Group in Washington and upon occasion was in the room while Fuller was discussing possible contracts with customers.

Curley did not execute any contracts. He did not, so far as the record shows, know of the brochure. He signed no letters. Except for the introduction of clients to Fuller and statements of the nature of those which we have quoted, he did not participate in the negotiation of contracts with customers. There is a dispute as to the source of a payment to him of $3,500 in currency, which he used on August 8 to take up the second of two checks signed by one Newcomb, payable to and endorsed by Fuller, which had not cleared. The first money shown by the

---

3 The account book (Ex. 108) shows $5,000 received November 6 and 7, 1941, from Fells Plumbing and Heating Company, and $2,500 "check returned" to that Company November 19. No explanation of the items appears elsewhere. We include $2,500, the indicated net receipt, as received from this Company.

record to have been received by the Group was not received until August 12. Curley testified in the Municipal Court of the City of Boston that he had received that amount "from one of the officials of the Engineers' Group", shown to have been Fuller, and that he "worked with them in the development of business." He said that in the transaction he had acted "as a messenger or agent." There is no evidence purporting to show that Curley received any other money from the Group.

■ The principal point made by appellant Curley is that the trial court erred in refusing to direct a verdict of acquittal as to him. It is not disputed that upon a motion for a directed verdict, the judge must assume the truth of the Government's evidence and give the Government the benefit of all legitimate inferences to be drawn therefrom. Appellant relies upon statements of this and other courts concerning the tests by which a trial judge must determine the proper action upon the motion. For example, in Hammond v. United States, 1942, 75 U.S.App.D.C. 397, 127 F.2d 752, 753, this court quoted from Isbell v. United States [4] as follows: "Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt it is the duty of the trial judge to instruct the jury to return a 'verdict for the accused, and where all the substantial evidence is as consistent with innocence as 'with guilt it is the duty of the appellate court to reverse a judgment against him."

It is true that the quoted statement seems to say that unless the evidence excludes the hypothesis of innocence, the judge must direct a verdict. And it also seems to say that if the evidence is such that a reasonable mind might fairly conclude either innocence or guilt, a verdict of guilt must be reversed on appeal. But obviously neither of those translations is the law. Logically, the ultimate premise of that thesis is that if a reasonable mind might have a reasonable doubt, there is, therefore, a reasonable doubt. That is not true. Like many another rule become trite by repetition, the quoted statement is misleading and has become confused in application.

■ The functions of the jury include the determination of the credibility of witnesses, the weighing of the evidence, and the drawing of justifiable inferences of fact from proven facts. It is the function of the judge to deny the jury any opportunity to operate beyond its province. The jury may not be permitted to conjecture merely, or to conclude upon pure speculation or from passion, prejudice or sympathy. The critical point in this boundary is the existence or non-existence of a reasonable doubt as to guilt.[5] If the evidence is such that reasonable jurymen must necessarily have such a doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration. But if a reasonable mind might fairly have a reasonable doubt or might fairly not have one, the case is for the jury, and the decision is for the jurors to make. The law recognizes that the scope of a reasonable mind is broad. Its conclusion is not always a point certain, but, upon given evidence, may be one of a number of conclusions. Both innocence and guilt beyond reasonable doubt may lie fairly within the limits of reasonable conclusion from given facts. The judge's function is exhausted when he determines that the evidence does or does not permit the conclusion of guilt beyond reasonable doubt within the fair operation of a reasonable mind.

■ The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal,[6] must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable

4 8 Cir., 1915, 227 F. 788, 792.

5 See discussion in United States v. United States Gypsum Co., D.C.D.C.1943, 51 F.Supp. 613, 628–633.

6 Motion for judgment of acquittal under Rule 29(a) of the new Federal Rules of Criminal Procedure, 18 U.S.C.A. following section 687.

mind might fairly conclude guilt beyond reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter. In a given case, particularly one of circumstantial evidence, that determination may depend upon the difference between pure speculation and legitimate inference from proven facts. The task of the judge in such case is not easy, for the rule of reason is frequently difficult to apply, but we know of no way to avoid that difficulty.

To be valid, the first part of the above-quoted statement from the Hammond case, supra, must be understood to mean that the judge cannot let a case go to the jury unless there is evidence of some fact which to a reasonable mind fairly excludes the hypothesis of innocence. The statement refers to the requisite presence of evidence, and not to the absence or effect of other evidence. The second part of the quoted statement means that if, upon the whole of the evidence, a reasonable mind must be in balance as between guilt and innocence, a verdict of guilt cannot be sustained.

Although this court has made the statement we have quoted, the rule actually applied has been as we now state it. Thus, in the opinion in the Hammond case, supra, after the quoted sentence, the court went on to say, "In the light of the circumstances we have related, we think it impossible that a jury of reasonable men could have fairly reached the conclusion that appellant, in what he did, necessarily intended to commit rape." And in the Cady case,[7] the court said that the quoted rule "is not applicable here, because the facts established are such that the jury was fully warranted in deducing from them inferences which excluded every other hypothesis but that of guilt."

If the judge were to direct acquittal whenever in his opinion the evidence failed to exclude every hypothesis but that of guilt, he would preempt the functions of the jury. Under such rule, the judge would have to be convinced of guilt beyond peradventure of doubt before the jury would be permitted to consider the case. That is not the place of the jury in criminal procedure. They are the judges of the facts and of guilt or innocence, not merely a device for checking upon the conclusions of the judge.

It is said that the accused is presumed to be innocent. That statement is absolutely true, and it is also true that the presumption follows the accused until a verdict has been reached. But persuasion of guilt beyond a reasonable doubt overcomes the presumption. Our whole discussion centers about the function of determining reasonable doubt vel non. We hold that it is the jury's function, provided the evidence is such as to permit a reasonable mind fairly to reach either of the two conclusions. We do not in any way impinge upon the presumption of innocence. We find the rule of procedure by which that presumption is overcome.

The rule as we state it is supported not only by the reasoning we have indicated, but by ample authority.[8]

The confusion which seems to have arisen upon the subject is traceable, we think, to a failure to observe in some cases the clear difference between the tests applicable to a motion for a directed verdict and the tests by which a jury must determine its verdict. The trial judge must act upon the motion, and he must also instruct the jury. The difference between his functions and the functions of the jury makes a difference between the tests which must guide

[7] Cady v. United States, 1923, 54 App. D.C. 10, 293 F. 829, 830.

[8] Pierce v. United States, 1920, 252 U.S. 239, 40 S.Ct. 205, 64 L.Ed. 542; Stilson v. United States, 1919, 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154; Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Gorin v. United States, 1941, 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488; United States v. Manton, 2 Cir., 1938, 107 F.2d 834; United States v. Morley, 7 Cir., 1938, 99 F.2d 683; Smith v. United States, 1932, 61 App.D.C. 344, 62 F.2d 1061. See the discussion in United States v. United States Gypsum Co., D.C.D.C.,1943, 51 F. Supp. 613, 628–633.

him in acting upon the motion and the tests as to which he must instruct the jury.

The matter has an interesting historical background. Of course the roots lie in the long controversy over the respective functions of judges and juries in criminal cases. We need not recite that history here.[9] But a more specific historical chain of events appears in the reports. Originally the language quoted by this court in the Hammond case, supra, and above-quoted, was used in charges to the jury. The several reports of United States v. Babcock,[10] seem to have been the source of some of the later confusion. In one report[11] is the court's consideration of a motion to direct a verdict. After discussing the relative functions of judge and jury, and relying upon Hickman v. Jones,[12] and Sioux City & Pacific R. R. v. Stout,[13] the court held that upon the motion, not only all facts in evidence must be considered as admitted, "but also every conclusion which a jury might fairly or reasonably infer therefrom"; and that where different men equally sensible and equally impartial would make different inferences, the case is for the jury. Another report in the same case[14] contains the court's charge to the jury. Here the court used as a correct exposition of the law applicable to the jury, a portion of the opinion in People v. Bennett[15] as follows: "The evidence must be such as to exclude every (reasonable) hypothesis but that of his guilt of the offense imputed to him; or, in other words, the facts proved must all be consistent with and point to his guilt not only, but they must be inconsistent with his innocence." Years later, in Hart v. United States,[16] an appellate court considered whether the trial court erred in letting the case go to the jury, and, in affirming, said in part: "But, as we have said, the truth or falsity of the charge of unlawful combination, and of defendant's inculpating knowledge, could be determined only by inference from the facts shown; and the inference which the plaintiff in error insists should have been arbitrarily assumed was surely not a necessary one, and the jury has found it to be not even a reasonable one. We are clearly of opinion that it was not error to allow them to decide whether it was or not. The rule that, to justify conviction of crime, the evidence must be such as to exclude every reasonable hypothesis but that of guilt, has not, it will be observed, been overlooked. But by whom is this rule to be applied? In some cases, no doubt, by the court; but certainly not in such a one as this, where the reasonableness of the only hypothesis of innocence propounded presents at least a question upon which men of ordinary intelligence might honestly differ."

Then, still later, the Circuit Court of Appeals for the Eighth Circuit,[17] relying for authority upon People v. Bennett,[18] United States v. Babcock, No. 14,487,[19] United States v. Hart,[20] and United States v. McKenzie,[21] reversed a judgment for failure of the trial court to direct a verdict and recited the following as controlling upon the court in acting upon the motion: "Circumstantial evidence warrants a conviction in a criminal case, provided it is such as to exclude, every reasonable hypothesis but that of guilt of the offense imputed to the defendant; or, in other words, the facts proved must all be consistent with and point to his guilt only and inconsistent with his innocence. The hypothesis of guilt should flow naturally from the facts proved and be consistent with them all. If the evidence can be reconciled either with the the-

---

[9] See Bushell's Case, Vaughan 135, 6 How.St.Tr. 999 (1670); United States v. Battiste, C.C.D.Mass.,1835, 24 Fed.Cas. 1042, No. 14,545; State v. Fetterer, 1894, 65 Conn. 287, 32 A. 394; 9 Wigmore, Evidence (3d ed. 1940) § 2495(e); Warvelle, The Jurors and the Judge (1909) 23 Harv.L.Rev. 123, 128, 130, 131; Howe, Juries as Judges of Criminal Law (1939) 52 Harv.L.Rev. 582, 586, 603.

[10] C.C.E.D.Mo.,1876, 24 Fed.Cas. 909, 912, 913, Nos. 14,485, 14,486, 14,487.

[11] No. 14,486, 24 Fed.Cas. at 912.

[12] 1870, 9 Wall. 197, 19 L.Ed. 551.

[13] 1874, 17 Wall. 657, 21 L.Ed. 745.

[14] The charge to the jury is reported as Fed.Cas.No.14,487, 24 Fed.Cas. 913.

[15] 1872, 49 N.Y. 137.

[16] 3 Cir., 1898, 84 F. 799, 804.

[17] Vernon v. United States, 8 Cir., 1906, 146 F. 121, 123.

[18] Supra n. 15.

[19] Supra n. 14.

[20] Supra n. 16.

[21] D.C.S.D.Cal., 1887, 35 F. 826.

ory of innocence or of guilt the law requires that the defendant be given the benefit of the doubt and that the theory of innocence be adopted." In all of the cases which that court cited, the stated rule had been used as an instruction to the jury and was approved as such.

In Union Pacific Coal Co. v. United States,[22] the same court again recited the rule as applying to a motion for a directed verdict, this time Judge Sanborn speaking in the language which has been so frequently quoted and relying upon Vernon v. United States,[23] and the cases therein cited. Thereafter the same court, in Isbell v. United States [227 F. 793] [24] upon the same authorities, quoted the same rule, but this time the statement was under attack and the court explained its meaning at length. Judge Sanborn said: "The rule is that where *all* [25] the substantial evidence was as consistent with innocence as with guilt it is the duty of the appellate court to reverse the judgment against a defendant, not where there was a preponderance of the substantial evidence, or witnesses of the greater credibility in favor of his innocence, but where there was no substantial evidence, no substantial testimony nor credible witness whatever, of any facts inconsistent with the innocence of the accused. This is the only question the court is required or permitted to determine under this rule, and where there was any substantial evidence inconsistent with the innocence of the accused, although it may have been contradicted and overwhelmed by the testimony to the contrary, the weight of the evidence, the credibility of the witnesses and the guilt or innocence of the defendant are left to the determination of the jury." Judge Carland dissented in that case, because he said that the unexplained

statement of the rule is not the law, and concluded, "The explanation of what the language which I object to means **as set** forth in the majority opinion demonstrates, in my opinion, that it would be well to omit the language objected to."

In Nosowitz v. United States,[26] the Second Circuit used as the rule applicable to motions for directed verdict, without further explanation, the language which this court quoted in the Hammond case, supra, and cited Union Pacific Coal Co. v. United States [27] and Isbell v. United States,[28] as authority. The same court did the same thing in Romano v. United States,[29] citing Nosowitz v. United States [30] as authority. From that time on, that language has been repeatedly recited by various courts as the rule which must govern a trial judge in passing upon a motion for a directed verdict. As we have indicated, we are of opinion that the statement is erroneous for that purpose, or, at the least, misleading. It is correct as a guide for a jury in reaching a verdict. The minds in which a reasonable doubt, or its absence, must be established, are the minds of the jury.

It is only fair to say that the view which we take is perhaps at variance with the views which have been taken by some of the Circuit Courts of Appeal.[31]

█ Mindful of the rule of law as we have stated it, our first inquiry upon the facts in the case at bar is directed to the proof of a conspiracy to defraud. As we have pointed out, there was an organized Group and it had group activities. At the least, it rented offices, hired employees, paid telephone bills, made contracts, and did business. Appellants say that all the proven facts are consistent with the theory that the Group really expected that it would se-

---

[22] 8 Cir., 1909, 173 F. 737.
[23] Supra n. 17.
[24] Supra n. 4.
[25] The emphasis was indicated in the opinion.
[26] 2 Cir., 1922, 282 F. 575.
[27] Supra n. 22.
[28] Supra n. 4.
[29] 2 Cir., 1925, 9 F.2d 522.
[30] Supra n. 26.
[31] The Eighth Circuit, in Gargotta v. United States, 1935, 77 F.2d 977, the

Third Circuit, in Nicola v. United States, 1934, 72 F.2d 780; Grant v. United States, 3 Cir., 1931, 49 F.2d 118, and Graceffo v. United States, 3 Cir., 1931, 46 F.2d 852, the Tenth Circuit, in Parnell v. United States, 1933, 64 F.2d 324, 329 (on rehearing), and Leslie v. United States, 10 Cir., 1930, 43 F.2d 288 (see concurring opinion), and the Second Circuit, in Nosowitz v. United States, 1922, 282 F. 575, and Romano v. United States, 2 Cir., 1925, 9 F.2d 522, seem to have taken a view different from ours.

cure government contracts for its customers, to the profit of all concerned, but that its plans went awry; thus, that the plan was bona fide and merely failed of accomplishment. The contention ignores the misrepresentations, made from the very beginning, that the Group controlled the designation of contractors, that it actually had contracts to allocate, that its staff was large and experienced and its assets substantial. Those false representations as to existing facts may fairly be thought to disprove the claim of good faith in the plan. Moreover, the contention suffers from the failure of the Group to provide funds with which to carry on until its expected business should materialize. If the original plan had been bona fide, it is hard to see why appellants did not supply or secure funds with which to meet obviously necessary operating expenses and thus to protect the deposits they intended to hold for return. Certainly the members of the Group who were conscious of what was being done in their names were, at the least, indifferent to the eventual result to the customers. The most charitable view which is possible is that customers were induced by false statements to supply the funds with which the Group gambled on success in its genuine hopes. Even that would be obtaining money by false representations. The jury was entitled to put a less favorable construction upon the circumstances.

Furthermore, even if the main plan were legitimate, plans and agreements which were secondary to the main plan might be fraudulent. Suppose a group intended to enter the grocery business and to make huge profits; nevertheless, if stock in the enterprise were sold upon false representations of fact and the receipts from such sales were wilfully squandered in promotion and operating expenses instead of being applied to the declared uses, the scheme would be fraudulent. That the scheme was secondary to a legitimate actual and declared objective would be immaterial. So here, even if the prime purpose were ultimate profit to everybody, an agreement to defraud in the preparatory steps of the project would be sufficient to violate the statute.

The Supreme Court has said:[32] "Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances'. [Citing United States v. Manton, 2 Cir., 107 F.2d 834.]" It seems to us that in the case at bar the jury might reasonably conclude that, beyond a reasonable doubt, the members of this organized Group consciously planned to secure funds from outside parties by gross misrepresentations, and to spend that money, anticipating that if the main venture were successful abundant profits to all would result, but that if it failed the loss would be upon the customers and not upon the Group. If the Group knew that the venture was wholly a speculative risk, but persuaded the customers by false statements that reasonable certainty of success and full certainty of no loss were insured, the scheme was a scheme to obtain money by means of false representations and promises.

The next inquiry upon the facts in the case at bar concerns the participation of Curley. The crucial question at this point seems to us to be whether he knew of the wrongful acts being committed in the name of the Group. Because, if he knew, reasonable minds might fairly conclude that he must necessarily have been a participant in the scheme, i. e., a conspirator; that no other hypothesis is consistent with that knowledge and his acts. Was such knowledge on his part a legitimate inference from the proven facts? It seems to us that it was. He was president of the corporation. He was frequently in its offices. He introduced customers. He personally attempted to arrange with a bank for a "loan" which was to be left on deposit, a sham depiction of financial substance. The misrepresentations made by the Group were total, not incidental or occasional. They were made not to occasional customers or clients but to all of them. The misrepresentations were not as to whether a group, in control of certain contracts, was also in control of

---

[32] Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680.

others; this Group had control of no contracts whatever. The misrepresentations were not as to incidents of the staff and organization of the Group; it had no staff worthy of the name. The Group did not have funds which it might legitimately use for operating expenses and, by inadvertence or misconduct of an individual, dip into other funds which it was obligated to hold on deposit; it had no funds whatever, other than the deposits. Occasional, incidental or partial misrepresentation or misappropriation by one officer of a corporation may be unimpressive as a basis for imputing knowledge to another officer; but total misrepresentation of the corporate affairs and total diversion of funds is substantial ground for an inference of knowledge on the part of an active and experienced president. The jury might fairly and legitimately infer as a fact from the proven facts that Curley knew of the wrongs being committed. As we have said, if he knew, his proven activities with and on behalf of the Group might fairly lead, if not compel, reasonable men to conclude that he must necessarily have been a participant in the plans of the Group. It cannot be said that upon all this evidence reasonable minds must necessarily doubt that Curley was a participant in the activities of the Group.

All of the evidence to which we have referred was aliunde the declarations of alleged co-conspirators, and thus the preceding discussion is clear of any dispute as to the admissibility of such declarations. If our conclusions on the foregoing matter are correct, those declarations were admissible, and they tend to strengthen the contentions of the Government.

 The decision in the case rests squarely upon the rule of law governing the action of the trial judge upon the motion for directed verdict of acquittal and the action of an appellate court upon a verdict of conviction. We agree, as Curley contends, that upon the evidence reasonable minds might have had a reasonable doubt. As much might be said in many, if not in most, criminal cases. The jury, within the realm of reason, might have concluded that it was possible that Curley was merely a figurehead, that he had complete faith in Fuller, that he never asked any questions, that he was never informed as to the contents of the contracts with customers or the financial statements or the use of the money; in short, that it was possible that he was as much put upon as were the customers. If the jury had concluded that such was a reasonable possibility, it might have had a reasonable doubt as to guilt. But, as we have stated, that possibility is not the criterion which determines the action of the trial judge upon the motion for directed verdict and is not the basis upon which this court must test the validity of the verdict and the judgment. If the evidence reasonably permits a verdict of acquittal or a verdict of guilt, the decision is for the jury to make. In such case, an appellate court cannot disturb the judgment of the jury. If we ourselves doubted Curley's guilt, that doubt would be legally immaterial, in view of the evidence and the rule of law applicable. However, we think it proper to add, under the circumstances of the case, that to us, as to the jury, there is no doubt.

 We find no substantial error in the other respects in which the appellant Curley asserts that the trial court erred. That the substantive counts may relate to the overt acts charged in the conspiracy count, and that each participant in a conspiracy is liable upon substantive counts for all acts committed by another conspirator pursuant to the conspiracy, are settled by Pinkerton v. United States, (1946), 328 U. S. 640, 66 S.Ct. 1180. That Curley's testimony taken in the Municipal Court of the City of Boston, on behalf of a judgment creditor, was admissible in the present case, was settled by Feldman v. United States, 1944, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408, 154 A.L.R. 982.

Appellant Fuller makes the same contention as does Curley in respect to the motion for a directed verdict, but his contention has not the same foundation in the facts. Fuller was the active agent throughout. It is plain that the trial judge correctly denied Fuller's motion. We find no other error of substance in respect to this appellant.

Appellant Smith shows that he came into the organization late and left soon thereafter, being treasurer of it for only two months. He shows that he had difficulty in getting possession of the books and did not actually get them for a month. But the record indicates his activity in connection with the organization before he was treasurer, and he was an actual participant in the negotiation of several of the contracts with customers. He was shown to have knowledge of the state of the finances. We think the evidence sufficient to send the case to the jury and to sustain the verdict.

Appellant Smith urges as error the refusal of the court to admit in evidence 20 exhibits offered by him. His counsel refers to 14 of these as showing his good faith and the absence of any knowledge on his part of any fraud or misrepresentation.[33] From time to time during the presentation of the Government's evidence, counsel for Smith, in cross examination, presented the witnesses with documents which they identified. At one point Government counsel objected to this procedure on the ground that Smith was thereby making the witness his own witness, and that he could not introduce his own evidence in the course of cross examination. The court said, however, that in the interest of expedition he would permit a witness to identify a document while he was on the witness stand, although he would not let counsel for Smith pursue the matter beyond that point during the course of cross examination. In this manner the 20 exhibits were identified. When the evidence was apparently all in, both sides announced that they rested. This happened to be on a Friday, and the court thereupon excused the jury until Tuesday. Monday was devoted to a discussion of requests for instructions, and at the conclusion of that discussion, counsel for Smith said that he believed he had forgotten to offer formally in evidence the documents which had been identified. Government counsel protested on the ground that to admit the documents would be to reopen the case, requiring cross examination, rebuttal, etc. Counsel for Smith points out that the Government had had the documents for some two years, that they had been identified by Government witnesses, and that his failure to move their admission was an inadvertence purely technical in nature. The court ruled that it would not permit the reopening of the case at that stage.

In view of all the circumstances, including the nature of the exhibits, the absence of surprise to Government counsel, the manner of their identification, and the fact that the case had not been argued to the jury, we think that if the exclusion of these exhibits had affected the substantial rights of Smith, the action of the court might have constituted reversible error. Whether his substantial rights were affected depends upon the nature of the documents.

 We have carefully examined all of these exhibits. Some of them consist of correspondence between customers and Fuller, relating to the business of the corporation, and do not refer to Smith in any way; one is merely an inquiry from one company to another concerning Smith and Engineers' Group; two concern Smith's business activities after he left Engineers' Group, running from April, 1942, to August, 1943; one is a statement of the deposits made and checks issued by Smith while he was treasurer; and the last is a statement by Fuller showing that he authorized Smith to issue the checks which were issued. We do not see how these exhibits relate to Smith's good faith; they throw no light on it one way or the other. The nearest approach to the subject is one statement in a letter from a customer to Smith, in which the customer indicated that he then thought that Fuller was a rascal but that Smith did not deserve to be involved; but the author of that letter was on the witness stand dur-

---

[33] Our discussion does not relate to 4 of the 14. Smith Exhibit No. 2 became Government 163 and was admitted. Smith No. 7 became Government 98 and was admitted. Smith No. 9, although marked for identification, was not actually identified. Smith No. 20 was an affidavit of Smith himself and was clearly inadmissible as a self-serving declaration.

ing the trial and counsel had full opportunity to draw from him the full measure of his exoneration of Smith. It does not seem to us that the exclusion of this evidence, therefore, affected the substantial rights of Smith.[34]

Affirmed.

WILBUR K. MILLER, Associate Justice (dissenting in No. 9208).

It is my view that the jury should have been instructed to find the appellant, James M. Curley, not guilty. The wrongs were done by Fuller. Curley made no representations to anybody. He did not participate in negotiations with customers. He signed no letters, executed no contracts. He did not know of the brochure or the financial statement. He received no money or other thing of value. All this is admitted, even recited, in the court's opinion.

Whether Curley was guilty depended, therefore, on whether he knew of the wrongful acts being committed in the name of the Group. That, the court correctly says, is the crucial question with respect to him. There was no criminal intent if he did not know. If he knew, then it would follow that he had become a conspirator with Fuller. But the evidence of knowledge must be clear, not equivocal.[1]

It is true, of course, that whether Curley had knowledge of Fuller's wrongdoing could not be proved directly, but could

only be inferred from what Curley did. Nevertheless, the presumption of innocence insists that there be no equivocation in that proof. As always, it must convince beyond a reasonable doubt. If it be not of that quality, if it be not clear but equivocal, then the jury must not be permitted to speculate that the defendant is guilty.

Let us see then what Curley did. We need go no further than the court's opinion, where the proof of his acts is thus summarized: "He was president of the Group. He was frequently in its offices. He introduced customers. He personally attempted to arrange with a bank for a loan which was to be left on deposit. * * *"

That is all the record shows against Curley, except that he once attempted, at the request of a customer of the Group, to get Fuller to return that customer's deposit.

What of the quality of such proof? Is it unequivocal so as to fairly permit a jury to infer, beyond a reasonable doubt, that Curley knew of Fuller's wrongful acts? In that respect, again we need go no further than the court's opinion, where we read, "The jury, within the realm of reason, might have concluded that it was possible * * * that he was as much put upon as were the customers."

That statement, with which I quite agree, means that Curley's conduct was

---

[34] Judicial Code, § 269, as amended, 28 U.S.C.A. § 391.

[1] Justice Stone said in United States v. Falcone, 311 U.S. 205, 210, 61 S. Ct. 204, 207, 85 L.Ed. 128: "The gist of the offense of conspiracy as defined by § 37 of the Criminal Code, 18 U.S. C. § 88, 18 U.S.C.A. § 88, is agreement among the conspirators to commit an offense attended by an act of one or more of the conspirators to effect the object of the conspiracy. (Cases cited.) Those having no knowledge of the conspiracy are not conspirators * * *; and one who without more furnishes supplies to an illicit distiller is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy to which the distiller was a party but of which the supplier had no knowledge."

Mr. Justice Rutledge, writing in Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 1268, 87 L.Ed. 1674, said

that the Falcone decision "comes down merely to this, that one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; * * *" He then adds, "Without the knowledge, the intent cannot exist. United States v. Falcone, supra.* Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal."

---

* At this point, Mr. Justice Rutledge appended the following footnote, which seems to me to be of particular significance in the present case: "Although this principle was there applied to aiding and abetting a conspiracy among others, it has at least equal force in a situation where the charge is conspiring with another to further his unlawful conduct, without reference to any conspiracy between him and third persons."

reasonably consistent with his innocence. So, at the conclusion of the government's evidence, when the case was submitted to the jury, that body could believe every word said against Curley and still it must choose between inferring guilt or innocence, when the evidence afforded no reason for choosing the former instead of the latter. In such circumstances, it is impossible for the jury to infer guilt; it can only surmise it. Webster says that the word "infer" frequently implies little more than "surmise," but I have never supposed that such a connotation is proper concerning the action of a jury in a criminal case.

It should be remembered that in this case there was no room for weighing evidence, determining the credibility of witnesses, or drawing justifiable inferences from proved facts—all traditional functions of the jury. For, on the motion for a directed verdict, the government's evidence could be given the fullest weight, its witnesses could be regarded as credible, and yet the inference of guilt was not justifiable and the jury should not have been permitted to draw it. The reason is that the inference of guilt from circumstantial evidence is never justifiable when the proved facts at least equally well permit innocence to be inferred. Guilt can be inferred from such evidence only when it is so strongly compelled that the inference of innocence is excluded.

With the meagre evidence against Curley quite consistent with his innocence, as the court says, it seems to me that the case falls squarely within the rule announced by this court in Hammond v. United States:[2] "Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial judge to instruct the jury to return a verdict for the accused, and where all the substantial evidence is as consistent with innocence as with guilt it is the duty of the appellate court to reverse a judgment against him." This is not a new rule in this jurisdiction, for as far back as 1923, in Cady v. United States,[3]

this court spoke approvingly of it as a "Well-established and oft-repeated principle." I think it is a sound rule, because it is based upon the presumption of innocence. But the court's opinion in this case definitely overturns it and, in effect, announces that it is no longer necessary for the government's proof to foreclose the hypothesis of innocence.

To prove guilt beyond a reasonable doubt does not mean merely to prove certain facts which are as consistent with innocence as guilt. To me the expression means to submit evidence which produces in the minds of the jurors an abiding and conscientious conviction, to a moral certainty, that the accused is guilty. I am aware of the fact that his classic paraphrase of proof beyond a reasonable doubt by Chief Justice Shaw of Massachusetts[4] has been criticized of late, but I do not agree with the critics. Reasonable doubt is not eliminated by evidence from which the jury may draw either of two irreconcilable inferences.

There is in civil cases a rule which is apropos here, for if it be the rule in civil cases it is much more necessary that it be the rule also in similar situations in criminal cases. In Pennsylvania Railroad Co. v. Chamberlain, 288 U.S. 333, 339, 53 S.Ct. 391, 393, 77 L.Ed. 819, the Supreme Court said: "We, therefore, have a case belonging to that class of cases where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover."

Again, at page 340 of 288 U.S., at page 393 of 53 S.Ct., 77 L.Ed. 819, the Supreme Court quoted the following sentence with approval: "There being several inferences deducible from the facts which appear, and equally consistent with all those facts, the plaintiff has not maintained the proposition upon which alone he would be entitled to recover."

---

2 75 U.S.App.D.C. 397, 127 F.2d 752.
3 54 App.D.C. 10, 11, 293 F. 829, 830.

4 Commonwealth v. Webster, 5 Cush. 295, 320, 52 Am.Dec. 711.

The jury inferred guilt, when the court said it "might have concluded that it was possible" that Curley was innocent. We, therefore, have a case where proved facts give equal support to each of two inconsistent inferences. Judgment, as a matter of law, must go against the government which had thrown upon it by the presumption of innocence the necessity of justifying the inference of guilt.

Under the view of the evidence which the court has taken and in which in the main I concur, the Hammond case unquestionably required a reversal as to Curley. So my brothers of the majority say that the rule stated in the Hammond case is misleading and has become confused in application.

The confusion which they discern they attribute "to a failure to observe in some cases the clear difference between the tests applicable to a motion for a directed verdict and the tests by which a jury must determine its verdict." Originally, they say, the language quoted in the Hammond case was used in charges to the jury, and only later came in vogue as a guide for the court in considering a motion for a directed verdict. The opinion then adds that "the statement is erroneous for that purpose, or, at the least misleading. It is correct as a guide for the jury in reaching a verdict."

The implication is, I suppose, that gradually and through a sort of evolution, as it were, and perhaps inadvertently, numerous courts, including this one in the Hammond case, have fallen into error. It will be observed, however, that the Hammond opinion quotes its rule from Isbell v. United States, 227 F. 788, decided by the Eighth Circuit in 1915. Because of the learning, ability and industry of the members of this court who decided the Hammond case (Chief Justice Groner and Justices Edgerton and Rutledge, the latter now an associate justice of the Supreme Court of the United States) it may properly be inferred, or surmised, that the Isbell case was examined and considered carefully before its statement of the rule

was adopted. We may safely assume also that the court exhausted the authorities on the subject, and certainly it read and considered the dissenting opinion in the Isbell case. That dissent had the same quarrel with the statement quoted by us in the Hammond case which the majority raise in deciding this case. The basis of the dissent is identical with the basis of the court's opinion here.

It follows, therefore, that there was nothing inadvertent about the adoption of the Hammond rule. It was deliberately done by an able and unanimous court, after having attention sharply called to the theory which the opinion in this case says is the "true rule."

The case of Estep v. United States,[5] decided in 1943 by the Court of Appeals for the Tenth Circuit, is instructive in connection with the consideration of the present case.

Estep, Deluke and Henry were convicted of having devised a fraudulent scheme for the sale of mining stock and of having used the mail in connection with the sale of the stock in violation of the mail fraud statute, and of a conspiracy to devise the fraudulent scheme. It was amply proved that Henry and Deluke were guilty, although they maintained that they had an honest belief in the representations and promises which they had made. Upon the trial they reasserted their faith in the potentialities of the mining property. It was undisputed that the money obtained by the sale of the stock, with the exception of certain commissions, was used in the development and operation of the mines.

Estep contended that if there was a fraudulent scheme or conspiracy, he was never a party to it and never a conscious participator therein. The Circuit Court of Appeals held that the evidence was entirely sufficient to justify the conclusion of the jury that Henry and Deluke conspired to devise the scheme to defraud, and that one or more overt acts were committed in the furtherance of the conspiracy. But the court also held that there was no evidence reasonably tending to show that Estep or-

---

[5] 140 F.2d 40, 45.

iginally devised a scheme to defraud, or joined a conspiracy. It was contended by the government that he knowingly aided and assisted in the execution of the fraudulent scheme, and that he joined and adopted the conspiracy, and thereafter consciously participated therein by affirmative acts from which the jury was justified in holding him criminally responsible.

It is true, the court said, that guilty knowledge or criminal intent is usually a factual question for the jury, and is seldom provable by direct evidence, but must be inferred from facts and circumstances which reasonably tend to manifest a mental attitude. Quoting from Direct Sales Co., Inc., v. United States, 319 U.S. 703, 63 S. Ct. 1265, 87 L.Ed. 1674, the court said: "Without the knowledge, the intent cannot exist. * * * Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal."

The court then added: "Often the line between honest belief and purposeful misrepresentation is fine and indistinct, between the two however lies guilt or innocence, and where the evidence is evenly balanced between guilt and innocence, a conviction cannot stand."

The evidence against Curley was much weaker than that against Estep, but the proof in the two cases was, in some respects, strikingly similar. For example, Estep introduced Deluke to the members of his church and urged them to buy the stock of the various corporations. His intense interest in the venture greatly influenced the members of his church to purchase the stock. The court said that there could be no doubt that Estep was instrumental in the effectuation of a scheme which the jury found to be criminally fraudulent. But there was no direct proof tending to show that Estep profited, or hoped to profit, from the sale of the stock except that it might benefit the church of which he was the founder and leader. He was subjected to the same sales' psychology as the other members of his church, and his resistance was no greater.

Having recited more in detail what we have summarized, the court significantly said: "From the evidence, it is as reasonable to conclude that Estep was victimized by Henry and Deluke, as that he was a conscious participator in the fraudulent scheme or the conspiracy. We conclude that the verdict of the jury as to Estep is not supported by that degree of proof which we deem essential to a finding of guilty knowledge and criminal intent, and accordingly the judgment is reversed as to him."

In like manner, in this case it is as reasonable to conclude that Curley was victimized by Fuller, as that he was a conscious participator in the fraudulent scheme. It is my opinion, therefore, that the verdict of the jury as to Curley is not supported by that degree of proof which I deem essential to a finding of guilty knowledge and criminal intent, and accordingly I think the judgment as to him ought to be reversed.

My view of the evidence against Curley and of the sound and salutary principle of law which I think requires that he should go acquit is well stated in the dissenting opinion in Warner v. United States:[6] "Coming now to the evidence tending to prove defendant's guilt under Count 1 of the indictment, and what do we find? There is absolutely no direct or positive evidence. The sole reliance of the government is, and must rest upon, mere circumstantial evidence. * * *. And how does he (the writer of the prevailing opinion) attempt to justify the fact that the circumstantial evidence found in the record is sufficient to support the conviction? On the thought that, to his mind, the circumstances in evidence, when compared, tend more strongly to sustain the guilt than the innocence of defendant. As this position must depend more upon the cast of mind than upon the circumstances themselves, I had not thought such a view of a case could be taken. I had thought the rule to be, before circumstantial evidence proved anything, this evidence must arise to such dignity of proof as to exclude any and every other reasonable hypothesis than the guilt of the accused. I had thought this theory of circumstantial evidence was simple hornbook law, not needing any author-

ity in its support. If it does, the books are full of cases laying down this rule, that circumstantial evidence which fails to arise to this high degree of proof is no evidence at all (and)[7] proves nothing.

"Such, to my mind, is the law and the rule to be at all times applied or the presumption of innocence with which a defendant stands before the bar of justice clothed by the law is not overcome. Who can say, who does say, in this case, the evidence in this case arises to such dignity as to exclude every other reasonable theory than the guilt of defendant?"

Even the majority opinion in the Warner case says that "Substantial evidence was requisite that was more consistent with his guilt than with his innocence."[8] This is not in accord with the court's opinion in this case which squarely holds that the function of determining reasonable doubt vel non "is the jury's function, provided the evidence is such as to permit a reasonable mind fairly to reach either of the two conclusions." Such a statement is so far from being either safe or sound that I am unable to agree with the majority and must, with all deference, dissent.

---

[7] Patent omission supplied.

[8] In Williams v. United States, 78 U.S. App.D.C. 322, 140 F.2d 351, 352, this court said: "To sustain it (the conviction) we should have to find, at least, that the evidence is more consistent with guilt than with innocence. Warner v. United States, 10 Cir., 60 F.2d 700."