**Walter MAHLUM, Appellant,**

v.

**Robert O. CARLSON and the OIL SCREW YUKON, her boilers, engines, appurtenances and equipment, Appellees.**

**No. 17111.**

United States Court of Appeals
Ninth Circuit.

June 7, 1962.

Bell, Sanders & Tallman, and Bailey E. Bell, William H. Sanders, and James K. Tallman, Anchorage, Alaska, for appellant.

Arthur D. Talbot, and Hughes & Thorsness, Anchorage, Alaska, for appellees.

Before BONE, CHAMBERS and HAMLIN, Circuit Judges.

CHAMBERS, Circuit Judge.

Upon a dispute from Alaska arising out of the injuries of a seaman, Mahlum, on a fishing boat, the Oil Screw Yukon, we are asked to define the nature and extent of proper jurisdiction of the former United States District Court for the Territory of Alaska during the period January 3, 1959, to February 20, 1960, when it lingered on adjudicating cases after statehood as it was authorized to do by the Alaska Enabling Act, Public Law 85–508, 48 U.S.C.A. preceding section 21.

Mahlum was employed about June 1, 1958, by Carlson, owner, as a seaman-fisherman on the Yukon, and on June 18, 1958, while performing his duties at sea, caught his left hand in some revolving gears, with a resulting injury.

On October 27, 1958, Mahlum as libelant filed in the United States District Court for the Territory of Alaska, Third Division (Anchorage), a libel in rem against the Yukon and in personam as to Carlson. Thus, the admiralty jurisdiction of the court was invoked. In the libel, Mahlum asserted unseaworthiness of the vessel and negligence of Carlson and sought damages for his injury. Then there was a count for maintenance and cure. And there was a final count for loss of wages for the fishing season.

On October 29 a citation in personam and a monition and attachment were issued by the clerk of the court (thus, the latter, the in rem phase of the case, was under way). On November 4, 1958, the marshal made his service, took possession of the Yukon and tied her in the small boat harbor at Kodiak, Alaska. Although the marshal's return as of the time of seizure does not show it, after the seizure a very pleasant arrangement was entered into whereunder Carlson (sic), the libelee, was hired as custodian of his own boat by the marshal for $20 a day. The record never tells when Mahlum became aware of this bargain, although the fact became a matter of record on December 2, 1958. In the end, Carlson had a bill for services for $3320 for five and one-half months.

On or before the return day, various claimants appeared, all of whom have now left the case.

On January 3, 1959, the date Alaska's statehood became effective, we now take judicial notice of the fact that there was much concern throughout Alaska about the status of the jurisdiction of the Interim Court (the old territorial court). But Mahlum's counsel were satisfied with it. On March 11, 1959, they filed a motion for an interlocutory sale of the vessel essentially on the ground she was eating herself up with marine insurance costing one hundred dollars a month and other costs. This motion shows an awareness that Carlson was the custodian of his own boat, but does not show an awareness by Mahlum's counsel that Carlson was to be compensated.

On March 27, 1959, still satisfied with the jurisdiction of the interim court, Mahlum's counsel appeared at a session of the court, where their motion for default and interlocutory order of sale were ordered granted. On April 1, 1959, formal orders establishing the default and ordering sale of the Yukon were prepared by the same counsel, signed by the judge, and filed by the clerk. A few days later there was an amended order to take care of a technicality on notice. Thereupon, a writ for the sale issued.

The sale of the boat was held April 20, 1959, at Kodiak. One K. C. Britt was the purchaser at $3,000. He later added $800 more for some of the costs. The major items in the cost bill of $3,896.06 were $3,320 to Carlson, libelee, for keeping his own boat during the winter when it probably could not have been used anyway, $400 for marine insurance, and $55 for wharfage. The other items were the usual fees and costs of a marshal. Obviously, out of the sale there would be no money for Mahlum when his claims were ultimately established.

Inasmuch as the result of the sale was displeasing, Mahlum made no motion to confirm the sale, but Britt, the purchaser, did file such a motion on May 15, 1959, which was eventually granted on June 24, 1959.

In the meantime, on June 18, 1959, still satisfied with the jurisdiction of the interim court, Mahlum's counsel made a motion for a resale of the boat. The pitch of the motion was that another sale surely would bring more money, and an affidavit as to intentions of others to bid was submitted.

On June 25, 1959, their own rocket (the sale they had procured) having misfired, Mahlum's counsel decided that they had had no right to launch the rocket in the first place and that the policeman (the court) had no right to let them do it.

Thus, the interim court was genuine so long as it ruled with Mahlum. It was an impostor if it did not. The motion to stay the proceedings in the interim court was for the reason "that the state (sic) court has no jurisdiction," apparently referring to the interim court.

On July 31, 1959, the interim judge denied the motion to hold a new sale, denied the motion to stay further proceedings and refused to vacate his order confirming sale entered on June 25, 1959.

In October, 1959, someone was "wanting his money." The court directed counsel for libelant to prepare an order for the clerk to disburse the $3,800 collected by the marshal from the sale (and Britt's subsequent contribution) and turned over to the clerk. The record would indicate Mahlum's counsel never found time to do this. On February 16, 1960, some kind of a hearing was had and the clerk was directed to prepare his own order for the court to sign to disburse the funds to pay Carlson, the libelee.

On February 17, 1960, counsel for Mahlum having further mulled over the quizzical prospect of paying Carlson, the alleged non-feasor, the proceeds of the sale of his boat, filed a motion to withhold paying Carlson because the money ought to go to Mahlum when he got his decree. As an idea, it would seem quite reasonable, but the next day, February 18, the court denied the motion. Simultaneously, the court ordered the distribution of the money proceeds of the marshal's sale, with Carlson the main beneficiary. Out of this there would be nothing left for Mahlum. The propriety of the payment has not been specified as error.

But what of Mahlum? Default having been previously entered, he had appeared on June 15, 1959, and testified as to his injuries and the circumstances surrounding them. The hearing was continued to receive medical testimony, which was not received until September 18, 1959. On the latter date, the objection to the jurisdiction which had been made on June 25, 1959, was not renewed.

On February 19, 1960, the interim court rendered a decision on Mahlum's injuries (no judgment was entered). Mahlum was found to have suffered a loss of wages for the season of 1958 in the amount of $2,000 and his partial disability remaining on his left hand was fixed as damage in the amount of $4,875. The claim for maintenance seems not to have been supported by proof and no award for that was made. The decision of the interim judge ignored all aspects of the previous sale of the boat.

The life of the interim court expired on February 20, 1960, (the day after the decision was filed) with the President's proclamation that the new United States District Court was ready for business, Executive Order No. 10,867, 25 F.R. 1584.

On March 23, 1960, counsel for Mahlum obtained a final decree from the judge of the new United States District Court which was bottomed on three things:

"1. The default order against the libelee and the boat entered April 1, 1959, in the interim court;

"2. The hearings on liability and damages before the interim judge of the third division;

"3. The decision of the interim judge finding liability and damage to be $6,875."

The new court adopted the February 19, 1960, decision of the interim court as containing its findings of fact and conclusions of law. Little is said in the final decree about the sale of the boat, but the subject is not ignored. The decree does recite, " * * * [A]nd said vessel having been duly sold, and the sale thereof having been duly confirmed by this court * * *" and further " * * * [A]nd costs of the libelant having been duly taxed in the sum of $4,861.06 paid out of funds in the registry of court * * *." In the operative part of the final decree one finds, "Ordered that the clerk of this court pay to libelant or his proctor, any and all sums in the Registry of the court from the aforesaid sale of the vessel Oil Screw Yukon, any amount remaining after payment of the costs taxed not exceeding the amount of the judgment herein." It was an empty command because the boat had already eaten itself up with the cost of marine insurance and the wages of Carlson, the libelee. But still it appears that the judgment-decree was something Mahlum, by counsel, sought and obtained.

Twenty-eight days later, libelant moved, with the aid of the same proctors, as they say in admiralty, to vacate all proceedings before the interim court beginning with the order of April 1, 1959, granting the motion for default and the order of the same date for interlocutory sale and ending with the last-minute memorandum opinion of February 19, 1960, making the findings as to liability and damage. The asserted ground was that the interim court had no admiralty jurisdiction after January 3, 1959. This motion was denied on May 6, 1960, and on reconsideration was again denied on May 11, 1960. On the reconsideration on May 11, 1960, the judge of the new court makes, inter alia, this very significant statement:

"I find another difficulty here, and that is as to how this Court could set aside numerous orders of the proceedings before the former District Court, in view of the fact that the libelant himself has since presented to this Court a judgment, which is a final judgment on this action, in which the libelant recovered judgment against the respondent Carlson for the amount of damages expressly found by Judge McCarrey to be due him. That, in my judgment, is the final judgment of the case. How you expected to set aside the proceedings upon which the judgment was based and not set aside the judgment that the libelant himself presented is a mystery to me."

Notice of appeal was filed on May 23, 1960. The appeal was addressed to the final decree of March 23, 1960, and the order of May 6, 1960, denying Mahlum's motion to vacate the proceedings had by the territorial court while it was an interim court after statehood.

While if there are no facts beyond those which appear here we can share the libelant-appellant's indignation as to where the proceeds of the sale of the boat went, we are unable to share his view, which seems implicit, that the interim court had jurisdiction on even numbered days and did not have it on odd numbered days. And we cannot agree with him that he could ask the interim court to sell the boat as a wasting asset, get an order for the sale, which was followed by a sale, and then turn around and say, "I have been imposed upon, the court had no jurisdiction."

Even here appellant makes no effort to vacate the award made in his behalf, which was bottomed on the interim court's

findings in its decision of February 19, 1959.

We do not understand how the appellant could ask the successor court to uphold that part of the result in the interim court he liked and reject that which he did not like.

While it may be argued that the purpose of continuing for three years or less the old territorial court under the Alaska Enabling Act was to provide a tribunal to render a sort of contract justice on state cases for the new State of Alaska, we believe that the act contemplated, for the limited time therein provided, that the old court would perform as before, handling the state cases (which would have been federal before statehood) as well as federal.

This case was properly begun in the territorial court before statehood. We have in diversity cases the concept that jurisdiction is tested as of the time jurisdiction attached. See Wichita Railroad, etc. v. Public Utilities Commission, 260 U.S. 48, 43 S.Ct. 51, 67 L.Ed. 124, Boesenberg v. Chicago Title & Trust Co., 7 Cir., 128 F.2d 245, 141 A.L.R. 565. Although we find no case directly in point, for lack of a parallel set of facts, we are inclined to hold that as to all federal cases other than criminal pending on January 3, 1959, it was perfectly constitutional to provide that the territorial court continue on and adjudicate federal cases pending. Of course, we are not concerned with a "state" type of case, so we express no opinion thereon. But see Metlakatla Indian Community, etc. v. Egan, 363 U.S. 555, 80 S.Ct. 1321, 4 L.Ed.2d 1397. Further, our caveat on criminal cases does not mean that we have held that any or all criminal business transacted by the interim court was void. But there are some jurisdictional arguments peculiar to criminal cases that we should not invade here by dicta.

Traditionally, the concept has been that territorialism ends the minute statehood begins, but there are loose ends. New courthouses or equivalent facilities must be made ready. So we see no particular present day objection to transition provisions to operate within a limited time with vestiges of territorialism. Perhaps Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865, and Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, are of some value.

The interim court was a court created or continued by Congress, and we further hold that one with eyes open who sought its help as Mahlum did cannot later claim he was imposed upon. Cf. Leary v. United States, 9 Cir., 268 F.2d 623. It was not like the District Court of the Confederate States of America for the Northern District of Alabama, whose jurisdiction failed because of the ultimate failure of the southern armies and was thus labeled an impostor. Hickman v. Jones, 9 Wall. 197, 19 L.Ed. 551.

Further, here we had provision for transfer (see § 15 of the act) of cases out of the old territorial court pending on January 3, 1959, to the new United States District Court (which may have had a theoretical existence before February 19, 1960, when Judge Walter H. Hodge qualified as the first constitutional United States District Judge for the new District of Alaska). When Mahlum presented his decree, which was signed on March 23, 1960, allusions were made therein to the intermediate proceedings of sale of the boat. We hold that, having procured such a decree, he has stated no valid ground for undoing a portion of the effect thereof. He was the victim of no fraud or mistake.

Affirmed.

HAMLIN, Circuit Judge (concurring).

I concur in the affirmance of the judgment in the above case upon the rationale expressed in my dissent in Woodring v. United States, 304 F.2d 308 (9th Cir. 1962), and more specifically by reason of the provisions of sections 15 and 18 of the Alaska Statehood Act, 72 Stat. 339 (1958), 48 U.S.C.A. preceding section 21.