**UNITED STATES of America,**

**v.**

**Martha STEWART and Peter Bacanovic, Defendants.**

**No. 03 CR. 717(MGC).**

United States District Court, S.D. New York.

Feb. 27, 2004.

David N. Kelley, U.S. Atty., S.D.N.Y., New York City, by Karen Patton Seymour, Michale S. Schachter, and William A. Berek, for U.S.

John J. Tigue, Jr., Rebecca A. Monck, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., Robert G. Morvillo, Morvillo, Abramowitz & Grand, P.C., New York, NY, for Defendants.

## OPINION

CEDARBAUM, District Judge.

Defendant Martha Stewart has moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. The motion is granted with respect to Count Nine only.

This is one of those rare cases in which the standard of proof makes a difference in the assessment of the sufficiency of the evidence. The Government argues, in effect, that evidentiary sufficiency is the same in civil and criminal securities fraud cases. However, the law is to the contrary. There was a time when the difference between the civil and criminal standards of proof, specifically "beyond a reasonable doubt," was not a factor in assessing the sufficiency of the evidence. *See United States v. Feinberg*, 140 F.2d 592, 594 (2d Cir.1944). That view of the law was explicitly rejected by the Second Circuit in *United States v. Taylor*, 464 F.2d 240, 242–43 (2d Cir.1972). Writing for the Court, Judge Friendly stated:

> It would seem at first blush—and we think also at second—that more 'facts in evidence' are needed for the judge to allow [jurors] 'of ordinary reason and fairness' to affirm the question the proponent 'is bound to maintain' when the proponent is required to establish this not merely by a preponderance of the evidence but, as all agree to be true in a criminal case, beyond a reasonable doubt.... We do not find a satisfying explanation in the *Feinberg* opinion why the judge should not place this higher burden on the prosecution in criminal proceedings before sending the case to the jury.

*Id.* at 242 (citation omitted). Judge Friendly drew an explicit connection to the Supreme Court's then-recent determination in *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," *id.* at 364, 90 S.Ct. 1068. In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court followed both *Taylor*

and *Winship* in holding that "[a]fter *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt," *id.* at 319, 99 S.Ct. 2781.

In *Taylor*, Judge Friendly also quoted Judge Prettyman's widely-cited formulation of the proper balancing of the duties of the judge and the jury from *Curley v. United States*, 160 F.2d 229 (D.C.Cir. 1947): "The true rule ... is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Id.* at 233 (*quoted in Taylor*, 464 F.2d at 243).

That Judge Friendly's reasoning in *Taylor* has been applied infrequently only indicates how rare is the case in which the evidence of an essential element of a charged crime is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir.1999) (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir.1982))(internal quotation marks omitted). Indeed, Judge Friendly noted that "while ... there will be few cases where application of Judge Prettyman's test would produce a different result, we cannot say these are non-existent." *Taylor*, 464 F.2d at 243. This is such a case.

Count Nine of the Indictment charges that defendant Stewart made materially false statements of fact regarding her sale of ImClone securities with the intention of defrauding and deceiving investors by slowing or stopping the erosion of the value of the securities issued by her own company, Martha Stewart Living Omnimedia ("MSLO"). In assessing the sufficiency of the evidence, I have concluded that no reasonable juror can find beyond a reasonable doubt that the defendant lied for the purpose of influencing the market for the securities of her company. Another way of putting it would be that in order to find the essential element of criminal intent beyond a reasonable doubt, a rational juror would have to speculate.

*Background*

The criminal charges against Stewart and Bacanovic arose from Stewart's December 27, 2001 sale of 3,928 shares of stock in ImClone Systems, Inc. ("ImClone"). ImClone is a biotechnology company whose then-chief executive officer, Samuel Waksal, was a friend of Stewart's and a client of Stewart's stockbroker at Merrill Lynch, defendant Bacanovic. On December 28, 2001, the day after Stewart sold her shares, ImClone announced that the Food and Drug Administration had rejected the company's application for approval of Erbitux, a cancer-fighting drug that ImClone had previously described as its lead product.

The Indictment alleges that on the morning of December 27, 2001, defendant Bacanovic learned that Waksal and several of his family members were selling or attempting to sell their ImClone shares. Bacanovic allegedly instructed his assistant, Douglas Faneuil, to inform Stewart of the Waksals' trading activity, and she sold her shares in response to that information.

According to the Indictment, the defendants then lied about the real reason for Stewart's sale in order to cover up what was possibly an illegal trade and to deflect attention from Stewart in the ensuing investigations into suspicious ImClone trad-

ing in advance of the Erbitux announcement. The defendants claimed that they had a standing agreement that Stewart would sell her position in ImClone if the stock fell to $60 per share.

The Indictment charges the defendants with conspiracy, obstruction of an agency proceeding, and making false statements to government officials. Bacanovic is also charged with perjury and making and using false documents.

Count Nine of the Indictment charges Stewart, the CEO of MSLO, with fraud in connection with the purchase ·and sale of MSLO securities in violation of 15 U.S.C. §§ 78b and 78ff. The count is based on three repetitive public statements she made in June of 2002 after the media began reporting investigations of her ImClone trades by the Securities and Exchange Commission ("SEC"), the United States Attorney's Office, and a congressional subcommittee. In the critical statements, Stewart described the agreement to sell ImClone at a predetermined price, stated that her trade was proper and denied trading on nonpublic information. ·

### Discussion

■ The Supreme Court has held that "scienter," or intent, in the civil securities fraud context, indicates a "mental state embracing intent to deceive, manipulate, or defraud," and is a required element of any claim of securities fraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185,·193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In a criminal prosecution, the Government must also prove that the defendant acted "willfully," that is, with a realization that she was acting wrongfully. *See United States v. Dixon*, 536 F.2d 1388, 1395 (2d Cir.1976). The Government contends that

the intent requirement is no different in criminal prosecutions under the securities laws than in civil litigation. The Government is certainly correct that securities law precedent developed in civil litigation has been freely applied in the criminal context. *See, e.g., United States v. Newman*, 664 F.2d 12, 16 (2d·Cir.1981). But the issue here is not whether criminal cases require a different definition of intent. Civil cases, because of their procedural posture, may not be particularly helpful in assessing a Rule 29 motion predicated on the lack of requisite intent. ·Few civil securities fraud opinions reach the question of sufficiency of the evidence— the question more frequently is whether the complaint states a claim upon which relief can be granted, or whether the existence of a material fact justifies denial of a motion for summary judgment. *See, e.g., AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir.2000) (appeal from the dismissal of a civil complaint). The issue at hand is not which definition of intent to apply, but whether, taking into account the heightened standard of proof in criminal cases, there is sufficient evidence of Stewart's intent to deceive investors to present the matter to the jury.

Taken in the light most favorable to the Government, the evidence presented at trial permits the jury to find the following facts relevant to the securities fraud charge.[1]

Gregory Blatt, MSLO's former general counsel, testified that Stewart held approximately sixty percent of the shares of common stock in MSLO and over ninety percent of the voting shares. The jury could reasonably infer from this evidence that

---

1. This summary does not include all of the evidence presented at trial to prove Count Nine. For the purposes of this motion, the falsity of Stewart's public statements is assumed.

Stewart had a significant financial stake in MSLO.

Other evidence indicated that Stewart, like most if not all CEOs of public companies, kept abreast of the market price of MSLO securities and was aware that certain activities could send a negative message to the market. Ann Armstrong, Stewart's personal assistant at MSLO, testified that James Follo, the Chief Financial Officer, e-mailed Stewart a stock report at the end of each business day. These reports included information on all of the stocks she owned, including MSLO. Gregory Blatt testified that MSLO had an unwritten policy that discouraged senior executives from selling more than twenty percent of their holdings in the company within a twelve-month period. The policy responded to a belief, held by Stewart and others, that the market might perceive significant insider sales as a signal of lack of confidence in the company, and that such a signal might drive down the share price. Blatt testified about a specific conversation that occurred after a former senior executive sold all of her MSLO stock as soon as it vested. During that conversation, Stewart and others stated that the sale sent a negative signal to the market because the company was newly public and the sale came too quickly after the initial public offering ("IPO"). David Topper, a managing director at Morgan Stanley who assisted MSLO in its IPO, testified that Stewart spoke to him of her background as a stockbroker and her familiarity with the securities markets. A reasonable jury could infer from this evidence that Stewart was aware of the market price of her company's stock and of matters that could affect the price of that stock.

The Government introduced into evidence MSLO's prospectus, written and disseminated at the time of the IPO in 1999, which detailed the importance of Stewart to the company's revenues and the value of its brands. Under the heading "Risk Factors," the prospectus notes:

> The loss of the services of Martha Stewart or other key employees would materially adversely affect our revenues, results of operations and prospects.

> We are highly dependent upon our founder, Chairman and Chief Executive Officer, Martha Stewart. Martha Stewart's talents, efforts, personality and leadership have been, and continue to be, critical to our success.

> The diminution or loss of the services of Martha Stewart, and any negative market or industry perception arising from that diminution or loss, would have a material adverse effect on our business.

The prospectus also states that:

> Our success depends on our brands and their value. Our business would be adversely affected if:

> Martha Stewart's public image or reputation were to be tarnished.

> Martha Stewart as well as her name, her image and the trademarks and other intellectual property rights relating to these, are integral to our marketing efforts and form the core of our brand name. Our continued success and the value of our brand name therefore depends, to a large degree, on the reputation of Martha Stewart.

A reasonable jury could infer from this evidence that Stewart was aware of the importance of her reputation to the continued health of MSLO.

The Government presented evidence, through the testimony of Peter J. Melley, an investigator with the Criminal Prosecution Assistance Group of the National Association of Securities Dealers, that the share price of MSLO stock began to fall on June 7, 2002, the day that the investigations of Stewart's ImClone trade were first

reported publicly, and continued falling throughout June of 2002. On June 13 and June 19 the share price experienced brief resurgences, only to continue to fall. The price of MSLO stock, which had closed at $19.01 on June 6, closed at $12.55 on June 24. The Government also presented evidence that throughout this period news coverage of Stewart's ImClone trade and the related investigations was widespread and intense. With respect to Stewart's state of mind, a reasonable jury could infer, based on the falling stock price and the ubiquitous news reports, that Stewart believed that the price of MSLO was falling in response to the negative publicity about the investigations.

The Government presented no evidence that Stewart expressed concerns to anyone about the response of MSLO stock to that negative publicity. Gregory Blatt did testify that he was concerned about the questions that advertisers, potential and actual MSLO business partners, and consumers of MSLO products were raising about the news of the investigations. Blatt agreed that a media company's advertising revenues affect the market price of its stock, but it was clear that his primary concern during the relevant time period was the more immediate, day-to-day pressures of anxious advertisers and partners. The jury could infer from his testimony only that some MSLO executives had concerns about the effect of the negative publicity on the company's business that were not immediately tied to the falling stock price.

The Government also introduced evidence of the timing, context, and substance of the three allegedly false public statements. The first statement appeared in *The Wall Street Journal* on June 7, 2002. Included in an article entitled "Martha Stewart Sold ImClone Stock," is the following paragraph:

According to her attorney, John Savarese, Ms. Stewart's sale, involving about 3,000 shares of ImClone, occurred on December 26 or 27. The sale was executed, he said, because Ms. Stewart had a predetermined price at which she planned to sell the stock. That determination, made more than a month before that trade, was to sell if the stock ever went below $60, he said. At the time, the stock was trading at about $60.

The second statement appeared in a press release issued after the close of business on June 12, 2002. Attributed to Stewart, the release read as follows:

In response to media inquiries, I want to reiterate the facts surrounding my sale of ImClone stock. I purchased 5,000 shares of ImClone several years ago in the public market. I tendered all of these shares in the $70 per share tender offer made by Bristol Myers to all public shareholders of ImClone in October 2001. Because the Bristol Myers offer was oversubscribed, I was able to sell only about 20% of my shares.

For the remaining 3,928 shares, I agreed with my broker several weeks after the tender offer, at a time when the ImClone shares were trading at about $70, that, if the ImClone stock price were to fall below $60, we would sell my holdings. On December 27, I returned a call from my broker advising me that ImClone had fallen below $60. I reiterated my instructions to sell the shares. The trade was promptly executed, at $58 per share. I did not speak to Dr. Samuel Waksal regarding my sale, and did not have any nonpublic information regarding ImClone when I sold my ImClone shares. After directing my broker to sell, I placed a call to Dr. Waksal's office to inquire about ImClone. I did not reach Dr. Waksal and he did not return my call.

In placing my trade I had no improper information. My transaction was entirely lawful.[2]

After the close of business on June 18, 2002, Stewart issued a third statement that essentially repeated the June 12 statement, only adding that she was cooperating fully with the investigations. The following day, she read the June 18 statement, with no substantive alterations, at a "Mid–Year Media Review" conference held in midtown Manhattan. Kevin Gruneich, an equities analyst at Bear, Stearns who was present at the conference, testified that it was attended primarily by securities analysts and portfolio managers. Investors were also present. The purpose of the conference was to provide a forum for the executives of media corporations to update the investment community about their companies' outlook and financial health. In addition to MSLO, executives from Gannett, Knight Ridder, and other organizations spoke at the conference. Stewart was one of four senior MSLO executives who participated in the presentation. Gruneich testified that MSLO's presentation lasted forty to forty-five minutes. The statement regarding her ImClone trade constitutes approximately one-half of one page of the eighteen-page transcript of MSLO's presentation at the conference. The transcript also shows that during the question-and-answer period that followed MSLO's presentation, none of the audience members inquired about the ImClone trade; rather, their questions related to MSLO's subscriptions, merchandise sales, and children's products.

The pertinent section of the transcript of Stewart's presentation on June 19 reads as follows:

I'll be detailing our television and merchandising business efforts, and growth strategies. First, however, I would like to address an issue in which all of you are probably interested. And this is a statement that I prepared just a little while ago. I know that you, as media analysts, members of the investment community, and members of the press are aware that the media focus surrounding ImClone has generated an enormous amount of misinformation and confusion. Many have speculated about what might have happened. In my June 12th statement, I explained what did happen, at least as pertains to me. I had no insider information. My sale of ImClone stock was entirely proper and lawful. The sale was based on information that was available to the public that day. The stock price had dropped substantially, to below $60. Since the stock had fallen below $60, I sold my shares, as I had previously agreed with my broker.

These are the essential facts. I am confident that time will bear them out. Earlier this year I spoke with the SEC and the U.S. Attorney's Office. I cooperated with them fully and to the best of my ability. Contrary to what you might have read, I am also cooperating fully with the House Energy and Commerce Subcommittee, as confirmed by Representative James Greenwood, chairman of the subcommittee on CNBC last evening. I have nothing to add on this matter today. And I'm here to talk about our terrific company, Martha Stewart Living Omnimedia, which I'd like to start doing right now.[3]

---

**2.** The Government alleges that within this statement, the following constitute materially false statements: Stewart's explanation that she had agreed with her broker to sell if ImClone's share price fell below $60; her claim that she reiterated her instructions to sell upon learning on December 27 that the price had fallen below $60; and her statement that she had no nonpublic information when she sold her shares.

■ A defendant seeking a judgment of acquittal pursuant to Fed.R.Crim.P. 29 faces a heavy burden. "Not only must the evidence be viewed in the light most favorable to the government and all permissible inferences drawn in its favor, but if the evidence, thus construed, suffices to convince any rational trier of fact of the defendant's guilt beyond a reasonable doubt," then the case must be presented to a jury. *United States v. Martinez,* 54 F.3d 1040, 1042 (2d Cir.1995) (citation omitted) (analyzing a postconviction challenge to the sufficiency of the evidence); *see also United States v. King,* 94 Cr. 455(LMM), 1997 WL 43617, at *8 (S.D.N.Y. Feb. 4, 1997) (applying *Martinez* to a motion for a judgment of acquittal). Moreover, "pieces of evidence must be viewed not in isolation but in conjunction," *United States v. Brown,* 776 F.2d 397, 403 (2d Cir.1985) (quoting *United States v. Geaney,* 417 F.2d 1116, 1121 (2d Cir.1969) (internal quotation marks omitted)).

With respect to inferences that may reasonably be drawn from the evidence, the Second Circuit has emphasized that "where a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible. We must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Martinez,* 54 F.3d at 1043; *see also United States v. Soto,* 47 F.3d 546, 549 (2d Cir. 1995); *United States v. D'Amato,* 39 F.3d 1249, 1256 (2d Cir.1994). The Supreme Court has noted that "[t]he defendant's intent in committing a crime is perhaps as close as one might hope to come to a core criminal offense 'element.' " *Apprendi v. New Jersey,* 530 U.S. 466, 493, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

Framing the issue in terms of the division of duties between judge and jury, Judge Friendly, quoting *Curley,* explained the process as follows:

> It is the function of the judge to deny the jury any opportunity to operate beyond its province. The jury may not be permitted to conjecture merely, or to conclude upon pure speculation . . . . The critical point in this boundary is the existence or non-existence of reasonable doubt as to guilt. If the evidence is such that reasonable jurymen must necessarily have such doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration.

*Taylor,* 464 F.2d at 243 (quoting *Curley,* 160 F.2d at 232).

■ The Government contends that a reasonable jury could draw inferences from the evidence outlined above that would permit it to find beyond a reasonable doubt that Stewart intended to deceive investors with her statements. Specifically, the Government argues that the evidence supports the inferences that Stewart was aware of the impact of the negative publicity about her ImClone trade on the market value of MSLO securities and on her personal wealth, and that Stewart deliberately directed her statements to investors in MSLO securities.[4]

---

3. Within this statement, the Government charges as materially false Stewart's statement that in her June 12th statement, she explained what happened; her statement that the sale on December 27 was based on publicly available information; her reiteration that her sale was pursuant to the $60 agreement; and her statement that she was cooperating with the authorities fully and to the best of her ability.

4. The Government argues that two other pieces of evidence give rise to permissible inferences of criminal intent. First, the Gov-

Mindful of the standards outlined above, and viewing the evidence in its totality and in the light most favorable to the Government's case, I hold that a reasonable juror could not, without resorting to speculation and surmise, find beyond a reasonable doubt that Stewart's purpose was to influence the market in MSLO securities.

As an initial matter, any intent to defraud that could be inferred from the fact that Stewart made the third statement to an audience of analysts and investors cannot retroactively endow her previous statements with a bad purpose. While it is true that for the purposes of a Rule 29 motion, evidence cannot be viewed in isolation, these statements are essentially discrete occurrences, separated from one another by several days' time. They are similar in substance, but that alone does not permit an inference that the defendant's state of mind when making the June 18 statement is sufficient evidence to find beyond a reasonable doubt that she had the same state of mind several days or weeks earlier. Accordingly, the first and second statements must stand or fall without reference to the audience of the third statement.

While the Government has presented evidence about Stewart's financial stake in MSLO and her awareness that her own reputation was crucial to the company, the Government has offered no evidence that

Stewart evinced a concern for the price of MSLO stock at any time during the relevant period. Indeed, the only evidence that executives at MSLO were concerned about the negative publicity came from Gregory Blatt, who spoke specifically of the questions from MSLO's advertisers, business partners, and the consumers of MSLO products.

As for the first statement, the Government contends that an inference of intent can be drawn from the fact that *The Wall Street Journal* is "the most widely read financial publication in the nation." Specifically, by making the statement to that newspaper, Stewart intended to influence investors with her statement. The Government presented no evidence that Stewart or her lawyer reached out to *The Wall Street Journal* as opposed to other publications. Thus, there is no evidence that Stewart chose the forum for the statement. The fact that *The Wall Street Journal,* as a financial publication, had an interest in an investigation into a stock trade by the well-known CEO of a public company does not evidence Stewart's intent.

The Government argues that Stewart's intent with respect to the second statement can be inferred from the fact that she released it knowing that it would be widely disseminated in financial publications. This argument, which can be made

ernment argues that because Stewart's statements are responsive in substance to the concerns articulated in the media regarding her trade in ImClone stock, an inference can be drawn that her statements were intended to induce reliance by the public, including investors, on her portrayal of the events. Because this argument does not distinguish meaningfully between the general public and MSLO investors, it cannot support a permissible inference of intent.

Second, the Government argues that the effect of the June 12 statement may be considered when contemplating Stewart's intent in issuing the June 18 statement. Her June 12

statement correlated with a temporary rebound of MSLO's share price, and the Government contends that the jury could infer that Stewart was seeking a similar effect on June 19. But the very fact that the rebound was only temporary indicates that this piece of evidence, while possibly relevant to materiality, is not germane to the issue of intent. If anything, the fact that Stewart issued the June 18 statement essentially unrevised, after the failure of the June 12 statement to effect any meaningful improvement in the share price, suggests that she did not intend to affect the market price of the stock.

with respect to any public statement, adds nothing to the evidence of criminal intent.

With respect to the June 18 statement, the Government contends that Stewart's awareness that she was speaking to analysts and investors, her prefatory statement that she was embarking upon a topic about which her audience was "probably interested," and the timing of the statement, which occurred as the stock continued to fall, are sufficient, in conjunction with the evidence previously outlined, to permit the jury to infer that she intended to deceive investors in MSLO securities when she made the statement.

This statement presents a closer question than the previous two. But just as individual pieces of evidence about intent must be viewed in conjunction when assessing the sufficiency of the whole, the fact that the June 18 statement was read to an audience of analysts and investors on June 19 cannot be viewed in isolation—the entire context of the statement must be considered. Thus, any inference to be drawn from the makeup of the audience must also take into account the fact that Stewart was only one of several representatives of MSLO, and that MSLO was only one of several corporations making presentations at the conference. The evidence does not show that the conference was organized by Stewart or her company. There is no evidence that the negative publicity about ImClone influenced Stewart's decision to attend and take advantage of a platform from which to reach investors directly. To the contrary, her statement—a very brief portion of a much longer presentation—indicates otherwise. The Government argues that her statement indicating an awareness that the audience was "probably interested" in what she had to say about the ImClone trade is meaningful. Yet her remarks at the close of the statement—"I have nothing to add on this

matter today. And I'm here to talk about our terrific company, Martha Stewart Living Omnimedia, which I'd like to start doing right now"—support an inference that she wanted to dispose of the issue and begin to address the subjects of the conference.

 It is true that the Government "need not refute every possible hypothesis supporting a defendant's innocence." *United States v. Friedman*, 300 F.3d 111, 123 (2d Cir.2002). At the same time, however, the Government "must do more than introduce evidence that is 'at least as consistent with innocence as with guilt.'" *D'Amato*, 39 F.3d at 1256 (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir.1991)). Insofar as the text of the statement is concerned, the competing intentions appear to be nearly in equipoise. The Government has not offered any evidence that tips the balance in favor of a rational finding of criminal intent beyond a reasonable doubt.

The third statement repeated information that Stewart had already publicized through the previous statements. Because the Government has not presented sufficient evidence of intent for the first two statements, and there is no evidence that Stewart attempted to refine or change this statement in any way that would tailor it to an audience of investors, nothing in the statement itself supports an inference of intent. Moreover, the Government presented no evidence that this statement was developed specifically to be read at the conference. Indeed, it was initially issued as a general press release to the public at large, and only the next day read at the conference.

In sum, when the nature of the audience is viewed within the overall context of the statement, this is too slight an addition to the total mix of evidence of intent to carry

the burden of proving criminal intent beyond a reasonable doubt.

The Government also contends that the falsity of the statements supports an inference that Stewart's intention was fraudulent. For the purposes of this motion, it is assumed that the evidence is sufficient for a reasonable jury to find that the statements were materially false. In some securities fraud cases, the falsity of a defendant's statements may lend weight to an inference of intent to deceive. But in this case, the falsehoods lack a direct connection to the supposed purpose of the alleged deception. The falsehoods involve Stewart's personal trade in the securities of ImClone. Evidence of intent to defraud investors of a different company is not readily discernible from the content of the falsehoods. Furthermore, to allow evidence of one essential element of a crime to make up for a dearth of evidence of another element runs dangerously close to ignoring the Second Circuit's injunction that where a fact supporting an essential element is concerned, the court must be assured that inferences in the Government's favor are not only permissible, but supported by sufficient evidence. *See Martinez*, 54 F.3d at 1043. In the cases that the Government cites, the misrepresentations are directly related to the purpose of the deception. *See United States v. Brewer*, 598 F.2d 387 (5th Cir.1979); *United States v. Bailey*, 327 F.3d 1131 (10th Cir.2003). Because the falsehoods about trading in ImClone securities are only circuitously related to the purpose of deceiving investors in MSLO securities, the falsity of Stewart's statements is less significant in assessing the sufficiency of evidence of intent.

Finally, the Government argues that the possibility that Stewart possessed multiple intentions when she made the public statements charged in Count Nine does not negate evidence that she possessed a criminal intent to deceive investors. While it is generally true that the Government is not required to prove that a defendant "have an exclusively illegal intent in order to be subject to the criminal laws," *United States v. Woodward*, 149 F.3d 46, 70 (1st Cir.1998), the purpose of a Rule 29 motion is to assess the sufficiency of the evidence actually adduced in a given case. Here, the evidence and inferences the Government presents are simply too weak to support a finding beyond a reasonable doubt of criminal intent. To compound that weak evidence with the reasonable inferences that Stewart possessed many other intents—to protest her innocence or repair her reputation, to reassure her business partners, advertisers, and the consumers of her products—would only invite the jury to speculate. And it would ignore the requirement that the standard of proof be considered in an assessment of the sufficiency of the evidence.[5]

### Conclusion

For the foregoing reasons, defendant Stewart's motion for a judgment of acquittal on Count Nine of the Indictment is granted.

SO ORDERED.

---

**5.** The defendant also argues that the evidence of the materiality of the statements and their connection to a purchase or sale of securities is insufficient. It is not necessary to reach those arguments.